2025 IL App (4th) 240278
NO. 4-24-0278

FILED
November 21, 2025
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| RASHOD MARTIN, Plenary Guardian of the Person and Estate of Rhonda McKinnie, a Disabled Adult, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Winnebago County |
| v. | ) | No. 16L319 |
| JASON LAYMAN, M.D.; SWEDISHAMERICAN HOSPITAL; JOSEPH GAZIANO, P.A.; and INFINITY HEALTHCARE PHYSICIANS, S.C., | ) ) ) | |
| Defendants | ) ) | |
| (Jason Layman, M.D.; SwedishAmerican Hospital; and Infinity Healthcare Physicians, S.C., Defendants-Appellees). | ) ) ) | Honorable Lisa R. Fabiano, Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Vancil and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1　　In July 2015, Rhonda McKinnie presented to the SwedishAmerican Hospital (SAH) emergency department with a set of symptoms that included blurred vision, hand and lip numbness, and a headache. Upon arrival, Rhonda signed a hospital consent form intended to notify her that all emergency department physicians and physician assistants (PAs) were independent contractors and not employees of the hospital.

¶ 2　　Joseph Gaziano, a PA, diagnosed Rhonda with an anxiety reaction and acute headache, treated her symptoms, and discharged her from the hospital without consulting Dr. Jason Layman, his supervising physician in the SAH emergency department. Approximately 10 hours later, Rhonda returned to the emergency department in an ambulance, generally unresponsive after having suffered a stroke.

¶ 3        In November 2016, Rhonda filed a complaint alleging medical negligence against Layman and SAH. The complaint was later twice amended to include additional counts against Gaziano and Infinity Healthcare Physicians, S.C. (Infinity)—Layman and Gaziano's employer—which contracted with SAH to staff SAH's emergency department. The second amended complaint (the subject of this appeal) was filed by Rhonda's son, Rashod Martin, who became the guardian of Rhonda's estate and person during the pendency of this case and supplanted Rhonda as the named plaintiff. The complaint alleged generally that (1) Gaziano and Layman were negligent due to their failure to treat Rhonda for a stroke, (2) SAH and Infinity were vicariously liable for Gaziano's and Layman's tortious acts, and (3) SAH and Infinity were directly liable for failing to implement appropriate treatment policies and procedures at the hospital.

¶ 4        In March 2022, Layman and Infinity filed a joint motion for summary judgment, arguing that Layman owed no legal duty to Rhonda. In May 2022, Infinity filed a separate motion for summary judgment, arguing that it could not be held directly liable for its alleged failure to implement policies and procedures at the hospital because Infinity had contractually agreed to follow SAH's own existing policies. In July 2022, SAH moved for partial summary judgment, arguing that it could not be vicariously liable for Layman's and Gaziano's tortious acts because they were not agents or employees of SAH.

¶ 5        In December 2023, following a hearing on the motions, the trial court granted summary judgment on the claims of (1) Layman's negligence, (2) Infinity's direct negligence, and (3) SAH's vicarious liability. The court noted that (1) Layman had neither any involvement in Rhonda's treatment nor a duty to be involved in her care; (2) although Infinity did not have its own procedures and policies in place, it had agreed that its employees would follow SAH's policies and procedures, which met the standard of care; and (3) SAH was not vicariously liable for

Layman and Gaziano because they were not SAH's agents or employees.

¶ 6        Plaintiff appeals, arguing the trial court erred by granting summary judgment on the issues of (1) SAH's vicarious liability, (2) Layman's negligence, and (3) Infinity's direct negligence. We agree only that summary judgment was inappropriate regarding SAH's vicarious liability because a question of material fact exists concerning whether Gaziano was an apparent agent of SAH. Accordingly, we affirm the trial court's grant of Infinity's motions for summary judgment, reverse its grant of summary judgment in favor of SAH regarding apparent agency, and remand for further proceedings.

¶ 7                          I. BACKGROUND

¶ 8                      A. Background Summary

¶ 9        To enable the reader to more easily understand the events underlying this appeal, we provide this brief summary of the most relevant undisputed facts and the procedural history before providing a more detailed background.

¶ 10        On the morning of July 24, 2015, Rhonda, then 37 years old, woke up experiencing a severe headache, tingling and numbness in her right lip and hand, and blurred vision in her left eye. Her mother, Rose McKinnie, took her to the emergency department of SAH. Upon arrival at 12:49 p.m., Rhonda signed a multipage consent for treatment form, which contained a disclaimer from SAH regarding the employment status of medical providers in the emergency department. She was then evaluated by Gaziano, a PA employed by Infinity, which was a medical staffing group that had an exclusive agreement with SAH to staff the emergency department.

¶ 11        Layman, also an Infinity employee, was the on-site attending and supervising physician in the emergency department that day. Gaziano, however, did not consult Layman regarding Rhonda's care. After his examination, Gaziano diagnosed Rhonda with an anxiety

reaction and an acute headache. At approximately 3:38 p.m., he noted that her symptoms had "resolved," and he discharged her.

¶ 12    Approximately 10 hours later, on the morning of July 25, 2015, Rhonda returned to the SAH emergency department with stroke symptoms. An MRI later confirmed she had suffered an ischemic stroke, which resulted in severe and permanent injuries.

¶ 13    In September 2020, Rashod filed a six-count second amended complaint alleging, in part, that (1) both Layman and Gaziano held themselves out as employees of SAH and did not inform Rhonda otherwise, (2) Rhonda reasonably believed all emergency department personnel were employees of SAH for the purpose of apparent agency, and (3) Layman and Gaziano were agents and employees of Infinity. She asserted claims of (1) medical negligence against Gaziano and Layman, (2) institutional negligence against SAH and Infinity, and (3) vicarious liability against SAH and Infinity for the actions of Gaziano and Layman under theories of actual and apparent agency.

¶ 14    Following discovery, defendants Layman, Infinity, and SAH filed separate motions for summary judgment. In support of their motions, defendants presented depositions taken from the medical providers and executives.

¶ 15    Gaziano testified that when Rhonda first presented at the emergency room, he considered that her symptoms could indicate that she was suffering from a stroke but deemed it improbable due to Rhonda's young age, lack of risk factors, history of stress, and the resolution of her symptoms before discharge.

¶ 16    Layman, the supervising physician, testified that he never saw or spoke to Rhonda and his signature on her chart was a supervisory "rubber stamp" done the next day. He opined that Gaziano met the standard of care and that the diagnosis of anxiety and headache was reasonable,

- 4 -

given her symptoms and medical history. This view was supported by Dr. Anthony Niezyniecki, another Infinity physician, who testified it was "standard practice" at SAH for PAs to discharge patients independently.

¶ 17 Dr. Glenn Aldinger, the chief executive officer of Infinity, confirmed that the decision to consult a physician was left "entirely to the discretion of the PA" and that a noninvolved supervising physician holds no responsibility for the care provided. Dr. Michael Polizzotto, SAH's chief medical officer, confirmed that the hospital did not "draw a line" regarding which patients a PA could see independently.

¶ 18 Finally, SAH's motion relied heavily on the consent form Rhonda signed, which explicitly stated that all emergency department physicians and PAs were independent contractors. SAH argued that this put her on notice and negated any claim of agency.

¶ 19 In opposition to summary judgment, Rashod presented his testimony and testimony from Rose. They described Rhonda's symptoms on the day of the incident as unusually severe, including a severe headache and slurred speech, and they testified that Rhonda was confused enough to provide an incorrect birth date to the emergency room staff. Rashod further testified that after Rhonda's discharge on July 24, 2015, she was still "off" and her speech remained slurred.

¶ 20 Plaintiff's neurological expert, Dr. Jonathan Edlow, opined that Rhonda presented with a transient ischemic attack (TIA) related to a left carotid artery event. He testified that (1) Gaziano deviated from the standard of care by failing to appreciate the TIA and (2) SAH was negligent for allowing the PA sole discretion in a case involving acute neurological symptoms. He stated that timely treatment with an antiplatelet medication could have reduced her risk of a major stroke by 80%.

¶ 21 Plaintiff's institutional negligence expert, Dr. John Ludgin, agreed with Edlow's

conclusions, testifying that SAH's own stroke protocol required a physician's involvement and that a system relying on a PA's sole discretion was "just wrong."

¶ 22    On December 22, 2023, the trial court granted all three of defendants' motions for summary judgment. The court concluded that SAH was not vicariously liable because (1) neither Layman nor Gaziano were actual agents of the hospital and (2) plaintiff could not establish apparent agency. In so ruling, the court relied heavily on the consent form Rhonda had signed. The court found that Layman owed no duty to Rhonda because (1) he was not involved in her care and (2) no case law supported extending institutional negligence, which applies to hospitals, to physician groups like Infinity. Finally, the court granted summary judgment for Infinity on the direct negligence claims, reasoning that Infinity had met its duty by contractually agreeing to abide by SAH's policies, which the court found met the standard of care.

¶ 23                              B. The Complaint

¶ 24    In November 2016, Rhonda filed a complaint alleging medical negligence against Layman and SAH. The complaint was later amended twice to include additional medical negligence counts against Gaziano and Infinity.

¶ 25    Count I alleged Layman acted negligently by failing to (1) perform a careful neurological exam of Rhonda, (2) recognize Rhonda's symptoms as signs of a stroke, (3) evaluate Rhonda for a possible stroke, and (4) communicate with other emergency department staff, including Gaziano. It further alleges he was negligent by (1) discharging Rhonda based on the assumption that her symptoms were from an anxiety attack and (2) discharging her prematurely in an unstable condition.

¶ 26    Count II alleged SAH was vicariously liable for Layman's negligence and liable for its own negligence by failing to implement policies and procedures regarding (1) when a patient

can be safely discharged from the emergency department and (2) recognizing the signs and symptoms of a stroke.

¶ 27    Count III alleged Infinity was vicariously liable for Layman's negligence and liable for its own negligence by failing to implement policies and procedures on (1) when a patient can be safely discharged from the emergency department and (2) the signs and symptoms of a stroke.

¶ 28    Count IV alleged Gaziano was negligent by (1) failing to carefully take Rhonda's history, (2) failing to carefully communicate pertinent information with members of the emergency department team, including Layman, and (3) assisting in prematurely discharging Rhonda.

¶ 29    Count V alleged SAH was vicariously liable for Gaziano's negligence and liable for its own negligence by failing to implement policies and procedures on (1) when a patient can be safely discharged from the emergency department and (2) recognizing the signs and symptoms of a stroke.

¶ 30    Count VI alleged Infinity was vicariously liable for Gaziano's negligence and liable for its own negligence by failing to implement policies and procedures on (1) when a patient can be safely discharged from the emergency department and (2) recognizing the signs and symptoms of a stroke.

¶ 31        C. The Motions for Summary Judgment—Exhibits

¶ 32    In July 2022, SAH moved for "partial summary judgment in its favor on all allegations of actual and apparent agency" involving codefendants Layman and Gaziano. SAH attached multiple exhibits to its motion for summary judgment, including (1) Rhonda's medical records, (2) the agreement between SAH and Infinity regarding hospital staffing, (3) the deposition testimony of Rose, Gaziano, and Layman, (4) Layman's answers to interrogatories, (5) a "physician extender professional service agreement" signed by Gaziano, (6) Infinity's answers to

interrogatories, (7) SAH's answers to interrogatories, and (8) Rashod's deposition.

¶ 33     In March 2022, Layman and Infinity filed a motion for summary judgment. The central argument was that no physician-patient relationship was ever formed. Infinity and Layman attached to their motion the depositions of Edlow, Niezyniecki, and Aldinger. Plaintiff's response included (1) Gaziano's deposition, (2) emergency room medical records, (3) Edlow's deposition, (4) Layman's deposition, (5) SAH's bylaws, (6) Polizzotto's deposition, (7) the deposition of Infinity's "Director of Revenue Cycle Management," Lisa Harrison, (8) Infinity's fee schedule, and (9) a copy of the American Academy of PA's "Guidelines for Ethical Conduct for the PA Profession."

¶ 34     In May 2022, Infinity moved for summary judgment on the direct negligence claim against it. Infinity attached to the motion multiple exhibits, including (1) the agreement between SAH and Infinity regarding hospital staffing, (2) SAH's policies and protocols for discharge of patients and strokes, (3) the deposition of plaintiff's institutional negligence expert, Ludgin, and (4) the deposition of Aldinger. Plaintiff's response included (1) the deposition of Edlow, (2) the deposition of Ludgin, (3) the stroke policies of SAH, (4) Gaziano's deposition, (5) Dr. Michael Polizotto's deposition, and (6) Rhonda's medical records.

¶ 35     We set forth below (1) the depositions and (2) scanned copies of (a) the consent form and (b) Gaziano's identification (ID) badge.

¶ 36                              1. *Depositions*

¶ 37                              a. Rashod Martin

¶ 38     Rashod testified that Rhonda was his mother. At the time of the deposition, Rashod was 23 years old and served as the legal representative for his mother's person and estate because her condition prevented her from speaking for or representing herself.

¶ 39        In 2015, before the stroke, Rashod and his three brothers—ages 20, 17, and 15—lived with their mother in Rockford, Illinois.

¶ 40        Rhonda, who was born in 1977, had been previously diagnosed with sleep apnea, anxiety, and depression. She used a continuous positive airway pressure (CPAP) machine every night and took Xanax for anxiety. From time to time, she would experience panic attacks or episodes of stress, but she had never complained of numbness or arm pain before. Rashod did not recall her ever having problems with her CPAP machine or blurry vision.

¶ 41        About a year before her stroke, Rhonda had been hospitalized overnight at Rockford Memorial Hospital to be evaluated for blood clots, which were ultimately ruled out, although she had a family history of blood clots—namely, her grandfather had experienced blood clots in his legs.

¶ 42        Rashod testified that on the day of the incident, "[Rhonda] woke up like normal, but this time she was screaming about a headache, [and] she doesn't scream that severe." She had tingling pain in her lip and arm, and her speech was slurred. She said, "I'm going to the [emergency room]." Rhonda's distress created a chaotic scene in the house. Rashod described her as screaming and holding her head. He also testified that she was able to talk but it was "slurred at that time. It was very few words."

¶ 43        When asked why he did not take Rhonda to the hospital, Rashod said that it was chaotic and he "could not think straight." His younger brother Charles called Rose, and Rhonda asked Rose to take her to the emergency department. Rose agreed, picked Rhonda up, and took her to the hospital. Rashod did not go with them.

¶ 44        While his mother was at the hospital, Rashod spoke with his grandmother on the phone. Rose told him that Rhonda had given the medical staff an incorrect birth date. Rashod

recalled his confusion, stating, "I was like, 'Why would—'I was confused, '[W]hy would she even do it because she knows her birthday.' "

¶ 45        After the hospital visit, Rose dropped Rhonda off at home. Rashod testified, "She just sat down. I could tell she was still off. She sat down, and she started slurring her speech, like, can you get me something, but she couldn't make out that sentence. She said '[E]at.' So, I said, 'Okay, I'm going to go get you something to eat.' " Rashod went to the store, and while he was there, his brother called him and said that Rhonda was on the floor, unresponsive. When Rashod arrived home, he observed that Rhonda could open her eyes but could not speak or form words. He directed one of his brothers to call 911. His grandparents arrived just before the ambulance.

¶ 46        Since the stroke, Rhonda has required assistance with nearly all her daily activities, including using the bathroom, dressing, and feeding herself. Rashod described her as not being communicative. He also mentioned that she has obsessive-compulsive disorder, but he acknowledged that this was not a formal diagnosis from a doctor.

¶ 47        Rashod testified that after Rhonda was transferred to UW Health University Hospital in Madison, Wisconsin, the head neurologist told them that the staff at SAH should have recognized the signs of a stroke from the numbness and headache during her first visit and done a better job of treating her.

¶ 48                            b. Rose McKinnie

¶ 49        In her deposition, Rose testified that she was 68 years old and, at the time of the incident, lived about 15 minutes away from Rhonda. Also, at that time, Rhonda was on disability and not working due to back problems that made it difficult to lift things or stand for long periods, though she was not wheelchair-bound. She was also a smoker, being treated for depression, and prescribed Xanax, an antianxiety medication.

- 10 -

¶ 50        On July 24, 2015, around noon, Rhonda called Rose complaining of a headache and a funny feeling in her lip, asking if she should go to the emergency department. Rose advised her to go and offered to take her. When she arrived at Rhonda's house, Rhonda walked out to the car without assistance. During the drive to SAH, Rose did not notice Rhonda slurring her speech or having difficulty recalling words.

¶ 51        After dropping Rhonda at the emergency department's entrance, Rose parked and found that Rhonda had already been taken to an examination room. When Rose joined her, Rhonda was on a gurney and told Rose that the staff, whom she identified as a male and a female provider, told her it was "just stress."

¶ 52        Rose did not witness a physical examination or blood being drawn. She did, however, recall arguing with Rhonda, who gave the medical staff an incorrect birth date. She recalled that at least the birth year was incorrect. Rose corrected Rhonda, stating she knew that Rhonda had not recited her correct birth date.

¶ 53        After a few hours, Rhonda was discharged. Rose did not receive or hear any discharge instructions being given to Rose. During the drive home, Rhonda was able to speak and told Rose that she still had a headache and was going to lie down. Later that night, between midnight and 1 a.m., Rose received a call from Tahiem, one of Rhonda's children, who told her something was wrong with Rhonda. When Rose and her husband arrived at Rhonda's house, an ambulance arrived at the same time. Her husband went inside and confirmed that Rhonda was unresponsive. The ambulance took Rhonda to the emergency department at SAH.

¶ 54        At the hospital for the second time, a doctor, whose name she could not recall, told her if she had been there earlier, they could have helped her. Rhonda was later transferred to UW Health University Hospital for further treatment, where doctors allegedly told Rose's husband that

Rhonda had a stroke and that if she had been there sooner, this would not have happened. Since the stroke, Rhonda requires total care, has lost the ability to move the right side of her body, struggles to speak and walk, and is confused now and then.

¶ 55                                    c. Joseph Gaziano

¶ 56         Gaziano testified that he had been hired by Infinity in February 2013, when he signed a "Physician Extender Professional Service Agreement." That agreement defined a "physician extender" as a nurse practitioner or PA and granted him "full power and authority to determine the manner in which [he] shall provide his medical services" but specified that he was required "to abide by such rules and regulations as are from time to time in effect at [SAH]."

¶ 57         In addition, the agreement with Infinity required that he "at all times devote his best efforts to the practice of emergency medicine." It further stipulated that his practice must "conform to and be consistent with the standards, rules, regulations, and principles of practice and ethics of the American College of Emergency Physicians and American Academy of Physician's Assistants." Gaziano confirmed that he was a member of the American Academy of Physician's Assistants in 2015.

¶ 58         In July 2015, he worked in the SAH emergency department as a certified PA. Prior to his deposition, Gaziano reviewed Rhonda's medical chart from July 24, 2015. Regarding his appearance that day, Gaziano testified he would have been wearing navy scrubs and possibly a white or gray lab coat. His ID badge would have displayed the names of both Infinity and SAH. He confirmed that he would not have voluntarily informed the patient that he was an employee of Infinity instead of SAH.

¶ 59         According to his recollection and the records, Rhonda checked in to the emergency room at 12:49 p.m. on July 24, 2015, and met with nurse Sara Baillargeon. Baillargeon left a note

in Rhonda's medical chart that stated that her symptoms had started when she had woken up around 11:30 a.m. Rhonda complained of numbness in her right hand and a headache on the left side of her face, particularly behind her left eye, which was accompanied by blurred vision in that eye.

¶ 60        Gaziano testified that he screened Rhonda at 1:07 p.m. Rhonda told him that she first noticed these symptoms when she awoke around 11:30 a.m. and had experienced a similar episode in the past that she associated with her CPAP machine. Gaziano performed a physical examination of Rhonda, during which he documented several normal findings, including equal grip strength in both hands, normal memory, normal mentation, and "grossly normal" cranial nerves. However, Gaziano did note an objective "sensation deficit to the right hand, right lower lip, and right side of the tongue." He explained that he did not believe this pattern was consistent with a localized stroke because the nerves supplying those areas originate from "very different geographic areas" of the brain.

¶ 61        Gaziano testified that Rhonda presented with an "8 out of 10" headache, though the charts reflected her memory as being normal. He stated that, hypothetically, if the only thing she could not remember was her birth date, he would not have considered it significant.

¶ 62        He testified that he had independent recollections from the visit that were not documented in the chart, including his belief that she appeared anxious, she seemed to be of sound mind, and her statement that she felt better by the time she left. He also recalled that she "seemed to be happy" upon discharge.

¶ 63        Gaziano explained that although he initially considered that her symptoms could be from a stroke, he ultimately believed it was not probable based on his full assessment. He cited several factors for this conclusion. First, at only 37 years old, Rhonda was very young. Second, she had no diagnosed history of hypertension, high cholesterol, prior TIAs, or other vascular

problems. Gaziano also noted that Rhonda reported significant life stress and told him that her symptoms were "freaking [her] out." From a clinical standpoint, Gaziano believed the numbness in her right lip and hand "didn't match a specific nerve pattern" for a stroke because the nerves for those areas originate in "very different parts of the brain." Finally, he stated that her symptoms had resolved by the time she left the emergency room, which further supported his conclusion.

¶ 64        At the time, he understood that the symptoms of a TIA could last for several hours, potentially up to three. He was also aware that a person who has had a TIA is at a higher risk of a future stroke. He recognized the signs of a stroke as defined by the National Institutes of Health, which include sudden numbness or weakness, particularly on one side of the body; abrupt confusion or difficulty speaking or understanding speech; sudden trouble with vision or walking; dizziness or loss of balance; and a sudden, severe headache with no known cause.

¶ 65        Gaziano stated that in 2015, SAH provided policies and procedures for its emergency department staff regarding stroke victims or possible stroke victims.

¶ 66        Although Gaziano did not recall the specific method by which he was given access to those policies and procedures, he knew he could look them up on SAH's website. He testified that he was never explicitly told by anyone from Infinity, including Layman, or by anyone from SAH that he needed to review and familiarize himself with these procedures. Despite this, he confirmed that he had, in fact, reviewed the hospital's stroke policies and procedures on his own initiative sometime after he began working there and prior to July 2015.

¶ 67        Gaziano testified that if he had suspected a patient was having a stroke, his practice would have been to inform the attending physician, who in this case was Layman. He was then presented with a copy of SAH's "Code of Conduct." Gaziano did not recall ever looking at that particular document or having it discussed with him by anyone from Infinity or SAH. He also

stated that he did not remember ever treating a patient who received a final diagnosis of a stroke during their emergency room visit.

¶ 68    Gaziano further testified that on July 24, 2015, Layman was his supervising physician and Layman signed Rhonda's chart but never met with her. He affirmed that if he had suspected a stroke, his standard procedure would have been to order a noncontrast CT scan of the head.

¶ 69    Although Gaziano believed Rhonda's symptoms had completely resolved by her 2:42 p.m. discharge, he acknowledged the chart stated her pain was listed as 3 out of 10 when she was discharged. Gaziano acknowledged that a "sudden" development of symptoms after Rhonda's waking would have changed his approach and prompted a consultation with Layman, but he understood that Rhonda's symptoms had developed over the morning.

¶ 70                              d. Dr. Jason Layman

¶ 71    Layman testified that he was hired by Infinity in July 2009 and became the director of the emergency department at SAH in January 2014. His responsibilities included general oversight of the department's physicians, PAs, and nurse practitioners and ensuring they understood all relevant policies and processes. He was compensated by Infinity for both his clinical and directorial roles. In July 2017, he also became the director of the primary stroke center at SAH.

¶ 72    Reviewing Rhonda's medical chart, Layman noted that on July 24, 2015, she presented with a left-sided headache and right-sided numbness in her lower lip, hand, and tongue. He confirmed the medications administered by Gaziano—Ativan, Reglan, Benadryl, and normal saline—were a common and reasonable treatment for headache syndromes and anxiety. He explained that a patient's positive response to these medications would help rule out a stroke, because a headache from a hemorrhagic stroke would likely not have resolved with that treatment

alone.

¶ 73    Layman testified that Gaziano was a "highly competent" and "excellent" PA whom he trusted to make appropriate assessments. He stated that based on Rhonda's chart, Gaziano performed an exam that assessed mental status changes, facial and eye movements, and strength and that normal findings from this exam would make a stroke diagnosis less likely. He confirmed that Gaziano's final diagnoses of anxiety reaction and acute headache were appropriate and reasonably explained the patient's symptoms.

¶ 74    Layman stated that in his opinion, to a reasonable degree of medical certainty, Rhonda was not having a stroke during her visit on July 24, 2015. He based this on the following factors: (1) at 37 years old, Rhonda was "very unlikely" to have a stroke; (2) her only risk factors were obesity and smoking; (3) she had no history of hypertension, high cholesterol, diabetes, or clotting issues; and (4) the presence of a severe headache alongside numbness argued against an ischemic stroke, which is typically not painful. Layman testified the symptoms were more consistent with a complex headache syndrome or anxiety, stating that Rhonda did not show any of the classic "F.A.S.T." (facial asymmetry, aphasia, speech, time) signs of a stroke. Further, (1) her speech and strength were normal, (2) she reported having experienced similar symptoms before under stressful circumstances, and (3) she reported that her symptoms were resolved after treatment.

¶ 75    Layman concluded that the standard of care did not require a CT scan or MRI, and he opined that even if a CT scan had been performed, it likely would have been negative and not changed the diagnosis.

¶ 76    Layman also confirmed that in 2015, SAH had a written stroke protocol that applied to all physicians, PAs, and nurses. He stated it was a "commonplace occurrence" for a PA to assess

and discharge a patient without ever speaking to the supervising physician. Although there was no all-encompassing written list governing when a PA must consult a physician, his expectation was that they would do so if the patient's care was outside their "scope of practice or area of expertise."

¶ 77    Layman affirmed that he never personally saw or spoke with Rhonda. He also had no recollection of speaking with Gaziano about Rhonda's case before her discharge, stating that the lack of documentation from either of them in the chart made such a conversation "unlikely."

¶ 78    Layman stated he electronically signed Rhonda's chart the following day, on July 25, 2015, from a remote location. He described this action as a supervisory "rubber stamp," indicating that he had reviewed the record and found Gaziano's documentation to be accurate and his care appropriate. He testified that he saw nothing in the chart that would cause him to question the diagnoses or treatment rendered. Layman stated he met his own standard of care as a supervising physician by being "present and available for consultation" and by reviewing the record after the fact.

¶ 79                            e. Dr. John Ludgin

¶ 80    Ludgin was disclosed as plaintiff's institutional negligence expert and testified based on his experience evaluating hospital systems and as a former chief medical officer in a hospital with an emergency department staffing model similar to that of SAH. He opined that based on Rhonda's presenting history on July 24, 2015, the emergency department providers should have initiated the hospital's stroke protocol. According to Ludgin, the protocol was "pretty clear about when a physician needs to be called" and required Gaziano to involve a physician rather than undertaking the entire evaluation independently. Ludgin strongly disagreed with the premise that it was solely up to Gaziano to decide whether to consult a supervising physician, calling such a process "just wrong," "either under these facts or under any facts." He testified that specific

hospital policies like the stroke protocol were intended to mandate a consultation, superseding general discretion.

¶ 81 Ludgin further confirmed that the agreement between Infinity and the hospital, as well as the conditions of medical staff membership, required Infinity's personnel to follow these hospital policies. Ludgin also noted that Infinity did not have its own separate policies but instead adopted the hospital's policies as the standard of practice for its employees working at SAH. Ludgin stated that Gaziano, as a PA, should have been aware of the protocol and trained on it. As a result, Gaziano should have then followed the stroke protocol at SAH and brought Rhonda's condition to a physician's attention. Throughout the deposition, Ludgin referred to SAH's stroke protocol as the appropriate standard that Gaziano failed to follow.

¶ 82                                 f. Dr. Glen Aldinger

¶ 83 Aldinger, the chief executive officer of Infinity and present director of the emergency department at SAH, testified regarding the 2005 agreement that governed the relationship between Infinity and SAH. According to Aldinger, Infinity was responsible for staffing the SAH emergency department with physicians and PAs. He testified that the decision to consult with a supervising physician about a patient's care was left entirely to the discretion of the PA.

¶ 84 Aldinger confirmed that, in 2015, Infinity had no specific written policies or guidelines that instructed a PA regarding when to consult a physician based on a patient's particular symptoms or condition. The only written guidance was a general requirement to conform to professional standards and a hospital privilege form that mandated a physician's involvement for specific procedures, not symptoms.

¶ 85 Aldinger opined that a PA who handles a patient's entire visit without a

physician's consultation should be held to the same standard of care as a physician. He further testified that a supervising physician who does not personally see the patient holds no responsibility for the care provided during that visit, even if they sign the chart later. He defined the physician's supervisory role in such instances as simply being "available" in case the PA identified a need for consultation.

¶ 86                                     g. Dr. Johnathan Edlow

¶ 87        Edlow, an emergency department physician and expert on neurological emergencies, testified as follows during his deposition.

¶ 88        Edlow opined that on July 24, 2015, Rhonda presented to the emergency department with a TIA. He identified her symptoms as "focal neurologic" and explained how the specific combination of a left-sided headache and blurred vision with right-sided numbness of the lip and hand "suggests a left carotid artery territory event." Edlow testified that although some of Rhonda's symptoms were atypical, they were not difficult to diagnose when viewed in the full context of her multiple vascular risk factors, which included obesity, smoking, sleep apnea, and later-documented hypertension and elevated lipids. In his expert opinion, for a patient with this cluster of symptoms and risk factors, the diagnosis is "a TIA until proven otherwise."

¶ 89        Edlow was critical of SAH's and Infinity's system for PA supervision. He testified that the standard of care required the hospital to have clear rules and guidelines, such as a "column A and Column B" list, that define which categories of patients a PA can see independently versus those that require a mandatory consultation with a physician. He stated that a patient with "acute neurological symptoms," like Rhonda, should have been on the list requiring a physician's involvement. He opined that it was a deviation from the standard of care for Layman and the hospital to "allow Mr. Gaziano to decide when to consult with him" in this situation.

¶ 90        Edlow opined that because of this flawed system, and based on the patient's presentation, Gaziano deviated from the standard of care when he failed to appreciate the seriousness of the TIA and "should have requested a consultation with the emergency department physician." This failure led to Rhonda's being discharged without the proper workup or treatment for her TIA and created a delay in her diagnosis and treatment. Edlow testified that this delay exacerbated her injuries when she suffered a "full-blown stroke" less than 12 hours later.

¶ 91        According to Edlow, this outcome was likely preventable. He testified that the most important and timely treatment for a TIA is the administration of antiplatelet medication, such as aspirin. Citing medical research, he stated that if TIA patients receive prompt antiplatelet treatment, "you can decrease that outcome of stroke by 80 percent."

¶ 92                           h. Dr. Michael Polizzotto

¶ 93        Polizzotto testified that in 2015, he was the chief medical officer for SAH. He testified that the 2005 service agreement established an exclusive relationship wherein Infinity staffed the SAH emergency department and SAH, in turn, provided liability insurance coverage for Infinity's physicians and PAs. According to his testimony, the agreement's only requirement for PA supervision was a single clause stating that Infinity "shall ensure that all physician extenders are supervised as required by applicable law."

¶ 94        Polizzotto acknowledged that SAH did not specify the types of care a PA could or could not provide independently and that the decision of when and whether to consult a supervising physician was left to the PA and the physicians employed by Infinity. He explained that the hospital's formal oversight was (1) limited to the initial credentialing and (2) a biennial reprivileging process, as well as a peer-review system that would only be triggered if a specific concern about a provider's care was raised. Ultimately, Polizzotto opined that it would not be a

violation of the agreement for a PA to see a patient, provide all care, and discharge them without ever involving a physician. He stated that although one could imagine a case so "obviously difficult, complicated, serious" that a physician should be involved, determining that threshold "is not a line that we [(SAH)] draw." Likewise, it would not be unusual for Layman to sign the patient's chart the next day.

¶ 95                                           i. Lisa Harrison

¶ 96          Lisa Harrison, who served as Infinity's "Director of Revenue Cycle Management" in 2015, testified regarding the company's billing records and practices. In 2015, Infinity utilized a proprietary, in-house billing system known as "Legacy" to generate claims from clinical data provided by the hospital. Harrison stated that sometime in 2015, Infinity began migrating to a new system, but the data from the Legacy system was not transferred. After the migration, on an unknown date, the Legacy system was "turned off," and its hardware was "disposed of."

¶ 97          In a 2022 affidavit, Harrison averred that a "diligent search" was conducted and that no billing records for Rhonda from 2015 exist "in the format that existed at that time." Her search consisted of speaking with two former employees who confirmed the Legacy system was defunct.

¶ 98          When Harrison was presented with an account summary for Rhonda that her department generated on July 9, 2019, she acknowledged that for this 2019 document to have been created, a "subset of data" from the Legacy system must have still been accessible at that time. The 2019 summary listed Layman as the provider for the services on July 24, 2015. When questioned, Harrison testified that a provider's name on a billing statement "does not necessarily mean that that is the person who performed a medical service," and she could not identify which provider's care was actually billed for in Rhonda's case. She stated she did not know where the

complete 2015 billing data was as of the date of her testimony or if it still existed.

¶ 99                                    j. Dr. Anthony Niezyniecki

¶ 100        Niezyniecki, a board-certified emergency department physician with 17 years of experience at SAH, testified regarding the hospital's emergency department procedures in 2015. Niezyniecki was employed by Infinity and explained that patients were assigned to a provider—either a physician or a PA—not based on the severity of their complaint but on provider availability, a process he characterized as a "luck of the draw." He testified that it was "standard practice" at SAH for PAs to provide all care for a patient, from admission through discharge, without speaking to a physician. He affirmed that PAs have the authority under their license to see patients, diagnose conditions, and prescribe medication independently.

¶ 101        Niezyniecki stated that when a PA handles an entire visit without a physician's consultation, they are acting as the "medical provider for the patient." When asked if a PA acting in this independent capacity should be held to the same standard of care as a physician, he answered, "Yes." Niezyniecki, who had no independent recollection of Rhonda, was presented with his own records from her prior emergency room visits between 2004 and 2013. These records established a long-standing, documented history of anxiety, depression, and panic attacks for which she was prescribed medication, and he noted that it is common for patients with anxiety to present with physical symptoms such as numbness and tingling.

¶ 102                              2. *Consent Form and ID Badge*

¶ 103        In addition to the depositions, relevant to this appeal, the parties attached copies of the consent form and ID badges of the providers. The consent form was four pages long, consisting of seven sections with headings labeled A through G in all-capitalized, bold, size-eight "sans serif" typeface. Those sections were titled as follows: (1) "Consent for General Medical Treatment,"

(2) "Notice: Independent, Non-Employee Status of Physician Providers, Students, and Residents," (3) "Assignment of Insurance Benefits/Financial Responsibility," (4) "Authorization for Disclosure of Medical Information," (5) "Notice of Privacy Practice: acknowledgement," (6) "Medicare: An acknowledgement of receipt of A Notice to Medicare Beneficiaries," and (7) "Advance Directive (Living Will and/or Power Of Attorney for Healthcare)." The body text under each section header is for the most part made up of normal or book sans serif typeface. The disclaimer section is the sole exception, being set in bold typeface and directly followed by a line for "Patient Initials," which Rhonda initialed, "R.M."

¶ 104    The following image is taken from the scanned copy of the first page of the four-page consent form Rhonda signed on July 24, 2015.

SwedishAmerican:A Division of UW Health
1401 E. State St. Rockford, IL 61104-2298

| MCKINNIE, RHONDA
| DOB: 09/01/1977
| L00133168484      M000667326
| EO               815 980-0542
| 07/24/15    PRIM INS : MCP-S

## POOR ORIGINAL

THIS IS AN ALL-INCLUSIVE FORM PERTAINING TO INPATIENTS, OUTPATIENTS AND EMERGENCY SERVICES. SECTION F APPLIES TO MEDICARE PATIENTS ONLY.

A. CONSENT FOR GENERAL MEDICAL TREATMENT

'I' or 'Me' or 'My', meaning either myself or a person for whom I have authority to consent to treatment, requests and consents to diagnostic and therapeutic care and treatment at SwedishAmerican Hospital and SwedishAmerican Health System (hereinafter SwedishAmerican Hospital/Health System'). I additionally authorize my physician, my provider, or their designee(s) to administer or order routine diagnostic and therapeutic services. I consent to medical, nursing and allied health students and residents to participate in my treatment. I recognize that medicine is not an exact science and acknowlege that no guarantees have been or can be made to me regarding the likelihood of success or treatment outcome of any diagnosis, test, surgery or examination.

B. NOTICE:INDEPENDENT,NON-EMPLOYEE STATUS OF PHYSICIAN,PROVIDERS,STUDENTS, AND RESIDENTS

THE FOLLOWING INDEPENDENT HEALTHCARE PROVIDERS ARE NOT EMPLOYEES OR AGENTS OF SWEDISHAMERICAN HOSPITAL, SWEDISHAMERICAN HEALTH SYSTEM, OR ANY OF ITS AFFILIATED ENTITIES:

All Emergency Department Physicians            All Pathologists
All Emergency Department Nurse Practitioners   All Radiolgists
All Emergency Department Physician Assistants  All Cardiologists
All Anesthesiologists                          All Certified Nurse Anesthetist(CRNA's)
All Residents in Training                      All Medical Students
All Individuals With a White Background on Their Security Badge

Any person whose Lab Coat, Clothing or Security Badge Includes a Name Other Than SwedishAmerican, including but not limited to such names as Rockford Surgical Services, RSS, Infinity Healthcare Physicians, Eagle Hospitalists, Rockford Gastroenterology Associates, RGA, and Surgical Associates of Northern Illinois.

Patient Initial _R.M._

with regard to other physicians, physician specialties, and providers not contained in the list immediately above this paragraph, I understand and recognize, that with limited exceptions, the physician/provider furnishing services ARE NOT EMPLOYERS OR AGENTS OF SWEDISHAMERICAN HOSPITAL, SWEDISHAMERICAN HEALTH SYSTEM, OR AFFILIATED ENTITIES.

Should the employment or agency status of any such physician or provider be important to me or should I be relying on any appearances of employment/agency status, I understand that I may check with the SwedishAmerican Hospital Administrative Offices on the first floor(phone 815 489-4002) to determine whether any named or (unnamed) physician or provider is an employee/agent. I agree that I am on notice that I should presume that any physician or provider is not an agent or employee  unless I have checked with the Administrative Office and have been informed that the physician or provider is an employee or agent.

A.CONSENT

Patient Consent/Assignment Form
SSAD-0200 1/10/14
Page 1 of 4

¶ 105    The following image is a scanned copy of Gaziano's ID badge for SAH.



¶ 106    D. The Motions for Summary Judgment – Arguments

¶ 107    1. *SAH's Motion for Summary Judgment*

¶ 108    In July 2022, SAH moved for "partial summary judgment in its favor on all allegations of actual and apparent agency" involving codefendants Layman and Gaziano. SAH argued that it was undisputed that Layman and Gaziano were independent contractors and not employed by SAH. Both were employed by Infinity, and both admitted that they were not employed by SAH at the time of Rhonda's visit to the emergency room. SAH further argued that no evidence existed that SAH had any control over the manner in which the emergency department providers provided care. In addition, Infinity billed separately for the services of Layman and Gaziano.

¶ 109    Regarding apparent agency, SAH argued that plaintiff could not satisfy the "holding out" requirement because there was no evidence that SAH or any of its alleged agents acted in a manner that would lead a reasonable person to conclude Layman and Gaziano were employees or agents of SAH. SAH claimed that no evidence existed showing that any of these alleged apparent agents acted in a manner that might create the appearance of authority and even if such evidence existed, nothing suggested that SAH had knowledge of and acquiesced in such conduct. Moreover, Rhonda signed 12 consent forms with SAH over the years, including one on

July 24, 2015. SAH also claimed Rhonda could not demonstrate justifiable reliance because nothing showed that she reasonably relied specifically on the hospital for her care.

¶ 110                    2. *Layman and Infinity's Motion for Summary Judgment*

¶ 111          In March 2022, Layman and Infinity filed a motion for summary judgment. The central argument was that no physician-patient relationship was ever formed. It was undisputed that Layman never saw Rhonda, never spoke to her or her family, and was never consulted by Gaziano regarding her care. Without any contact or affirmative act, no duty of care could arise. Citing the Physician Assistant Practice Act of 1987 (Physician Assistant Practice Act) (225 ILCS 95/7.5 (West 2014)), defendants argued that PAs are licensed to act independently and that the decision of when to consult a supervising physician is left to the PA's own clinical judgment. Defendants asserted that the Medical Practice Act of 1987 (Medical Practice Act) (225 ILCS 60/54.5(e) (West 2014)) "specifically grants immunity to physicians in exactly the same situation as in the case at bar" unless the physician had reason to believe the PA was incompetent. There was no evidence that Gaziano, a licensed and credentialed provider, was incompetent.

¶ 112   3. *Infinity's Motion for Summary Judgment Regarding Direct Negligence Claims*

¶ 113          In May 2022, Infinity moved for summary judgment on the direct negligence claim against it. Infinity noted it had been sued under two theories: (1) direct negligence for failure to implement policies and procedures and (2) vicarious liability for the alleged negligence of its employees, Gaziano and Layman. As to direct negligence, Infinity asserted it was "undisputed" that its contract with SAH required it to abide by the hospital's policies and protocols, which SAH had in place regarding both the discharge of patients from the emergency department and the signs and symptoms of a stroke. Infinity argued that its employees were "contractually obligated" to observe and utilize the policies and procedures of the hospital. Further, plaintiff's expert regarding

the direct negligence claims testified that the hospital's policies toward stroke victims were adequate and did not breach the hospital's institutional standard of care. Plaintiff's expert also agreed that Infinity was required to follow the hospital's policies and procedures. Infinity maintained that any allegations that its personnel did not follow hospital protocols and procedures "would be allegations falling under the agency claims rather than direct negligence claims." Infinity asserted, due to the lack of causation between any alleged institutional negligence by it and the injuries, it was entitled to summary judgment on the direct negligence claims against it.

¶ 114 Infinity primarily argued that no physician-patient relationship was ever formed between Layman and Rhonda. It was undisputed that Layman never saw the Rhonda, never spoke to her or her family, and was never consulted by Gaziano regarding her care. Without any contact or affirmative act, no duty of care could arise. Citing the Physician Assistant Practice Act, Infinity argued that PAs are licensed to act independently and that the decision of when to consult a supervising physician is left to the PA's own clinical judgment. Infinity further asserted that the Medical Practice Act provided immunity to a supervising physician for a PA's actions unless the physician had reason to believe the PA was incompetent. There was no evidence that Gaziano, a licensed and credentialed provider, was incompetent.

¶ 115 E. Plaintiff's Response to the Motions for Summary Judgment

¶ 116 1. *Plaintiff's Response to SAH's Motion*

¶ 117 In August 2022, plaintiff filed a response to SAH's motion for summary judgment, arguing that summary judgment on the issue of vicarious liability was inappropriate because a genuine questions of material fact existed regarding whether (1) SAH exercised sufficient control of Layman and Gaziano to make them actual agents of SAH and (2) SAH's consent form and the surrounding circumstances of Rhonda's visit defeated the "holding out" element of apparent

agency.

¶ 118     Regarding actual agency, plaintiff argued that SAH exercised sufficient control over Layman and Gaziano to create an implied agency relationship. Plaintiff pointed to the following facts in the record: (1) SAH paid for and maintained professional liability insurance for all Infinity employees in the emergency department; (2) the staffing agreement required Infinity's physicians to be approved by the hospital and become members of its medical staff, bound by hospital bylaws and rules; (3) SAH appointed Layman as the director of the emergency department, with responsibilities that included ensuring PAs knew and followed hospital protocols; and (4) SAH's own stroke protocol mandated that a PA consult a physician for the symptoms Rhonda exhibited, a protocol that plaintiff alleged Gaziano did not know. Plaintiff contended these facts created a triable issue of fact as to whether SAH controlled the actions of the Infinity providers.

¶ 119     Regarding apparent agency, plaintiff argued that SAH failed to defeat the "holding out" element as a matter of law. Plaintiff's primary argument was that the consent form should not be dispositive. Plaintiff asserted that Rhonda's physical and mental condition at the time of signing—blurred vision, a headache, and confusion so significant that she could not state her correct birth date—created a question of fact about her capacity to understand the document. Plaintiff also described the form itself as a confusing, four-page document with the relevant disclaimer language in a small, eight-point font. Further, plaintiff noted that Rhonda had signed this specific version of the consent form only one other time, which occurred 11 months before her July 2015 emergency visit. Other factors contributing to the appearance of employment included the ambiguous ID badges worn by Gaziano and Layman, which displayed both Infinity's and SAH's names. Finally, plaintiff argued it had met the "justifiable reliance" element because

Rhonda went to the hospital seeking emergency care services from the institution itself, not from any particular preselected provider.

¶ 120        2. *Plaintiff's Response to Layman and Infinity's Motion for Summary Judgment*

¶ 121        Plaintiff also responded to the motion for summary judgment of Layman and Infinity. Plaintiff argued that Layman owed a duty of ordinary medical care to Rhonda and was not protected by statutory immunity. This duty, plaintiff contended, arose from Layman's "several overlapping roles" as the (1) supervising physician for Gaziano, (2) attending physician present in the department, and (3) director of the emergency department. Plaintiff asserted that in these capacities, Layman was under a duty to ensure PAs were properly trained on and advised of the standard protocol for possible stroke victims. Plaintiff argued Layman breached this duty and pointed to evidence that Gaziano was not properly trained, had in fact never previously treated a stroke patient, and did not seek a physician's assistance before discharging Rhonda. Citing the Physician Assistant Practice Act, plaintiff further argued that the supervising physician maintains "final responsibility" for the patient's care. See 225 ILCS 95/4(3), (7) (West 2014). Plaintiff contended that the statutory immunity did not apply because Layman had reason to know Gaziano was not competent to handle a stroke case, given his inexperience.

¶ 122        3. *Plaintiff's Response to Infinity's Motion for Summary Judgment*

¶ 123        Plaintiff filed a response to Infinity's motion for summary judgment on the direct negligence claims. Plaintiff argued that despite the fact Rhonda presented to the hospital emergency department with symptoms listed on the SAH protocol for stroke patients, Gaziano did not follow that protocol and instead discharged her from the hospital. Plaintiff contended that Infinity was directly negligent for failing to develop any policies or procedures of its own, instead "merely relying on those of the hospital as per its contract with the hospital." Plaintiff also asserted

that Infinity was negligent in its staffing and training, arguing that it failed to recognize that its employee, Gaziano, had "no previous experience dealing with potential stroke victims" before placing him in a critical role in the emergency department. Plaintiff further alleged that Infinity "never trained him on hospital protocols, particularly for stroke victims." Plaintiff argued that these combined failures constituted institutional negligence by Infinity and these institutional failures and breaches were the "cause-in-fact" of the delayed diagnosis that led to Rhonda's severe stroke.

¶ 124     Plaintiff also argued that Infinity, as the entity staffing the emergency department, should be held to the same institutional negligence standard as a hospital. Infinity's duty was not to adopt SAH's policies merely on paper but to implement them by ensuring its staff was adequately trained and competent. The failure to train Gaziano on SAH's stroke protocol, especially given his inexperience, was a direct breach of this duty that caused the delay in her diagnosis.

¶ 125     F. The Trial Court's Order Granting Summary Judgment

¶ 126     In December 2023, the trial court issued its memorandum opinion granting (1) SAH's motion for partial summary judgment, (2) Layman and Infinity's joint motion for summary judgment, and (3) Infinity's motion for summary judgment on the direct negligence claims.

¶ 127     Regarding SAH's motion for partial summary judgment on the issue of vicarious liability, the trial court found that neither Layman nor Gaziano were actual agents of the hospital because it was undisputed they were independent contractors employed by Infinity. The court rejected plaintiff's arguments for an implied agency relationship, finding that factors such as SAH (1) providing liability insurance, (2) requiring staff privileges, and (3) having hospital-wide policies were insufficient to establish that SAH retained the right to control the providers' day-to-

day medical judgment. According to the court, the agreement between Infinity and SAH "indicates the clear intent of the parties to maintain an independent relationship between the hospital and Infinity physicians and physician extenders."

¶ 128 The trial court also found that SAH could not be held liable under a theory of apparent agency. It ruled that the consent form Rhonda signed "clearly, unambiguously and specifically" notified her that all emergency department physicians and PAs were not hospital employees, thereby negating the "holding out" element of the claim. Furthermore, the court found that plaintiff could not establish reasonable reliance because Rhonda had signed at least 12 similar consent forms during prior visits to SAH, including one with identical language just 11 months before the incident. Accordingly, "she could not reasonably rely on any conduct by the hospital or physician on the date of the treatment in question, as she was clearly on notice that the emergency department providers were not employees."

¶ 129 Next, the trial court granted summary judgment for Layman and Infinity, ruling that Layman owed no duty to Rhonda. The court reasoned that it was undisputed that Layman (1) had no involvement in Rhonda's care, (2) was never consulted by Gaziano, and (3) took no affirmative action regarding her treatment. Citing the Physician Assistant Practice Act (225 ILCS 95/7.5 (West 2014)), the court noted that PAs have the authority to treat patients using their own clinical judgment. It also cited the Medical Practice Act (225 ILCS 60/54.5(e) (West 2014)) for the principle that a physician is not liable for a PA's actions based solely on a supervision agreement.

¶ 130 Last, the trial court granted Infinity's motion for summary judgment on the direct negligence claims against it. Plaintiff had alleged that Infinity failed to implement its own policies for stroke symptoms and patient discharge. The court found that because Infinity's contract required it to abide by SAH's policies, and because plaintiff's own expert, Ludgin, testified that

SAH's policies met the standard of care, Infinity had effectively adopted adequate policies and thus did not breach its duty.

¶ 131    Plaintiff also argued in response to Infinity's motion for summary judgment that Infinity owed a duty to plaintiff to act as a reasonably careful hospital and breached that duty by failing to properly train Gaziano on the stroke and discharge policies. The trial court first noted that this claim was not contained in the second amended complaint, which was the subject of the motions for summary judgment and thus was not in contention. Nonetheless, the court declined to expand the tort of institutional negligence to a physician staffing agency like Infinity, finding it was not analogous to a hospital or health maintenance organization (HMO) in its function.

¶ 132    This appeal followed.

¶ 133                                II. ANALYSIS

¶ 134    Plaintiff appeals, arguing the trial court erred by granting summary judgment on the issues of (1) SAH's vicarious liability for Gaziano's and Layman's negligence, (2) Layman's direct negligence, and (3) Infinity's direct negligence. We agree that summary judgment was inappropriate regarding SAH's vicarious liability because there exists a question of material fact whether Gaziano was an apparent agent of SAH. Accordingly, we affirm the trial court's grant of Infinity's motions for summary judgment, reverse its grant of summary judgment in favor of SAH regarding apparent agency, and remand for further proceedings.

¶ 135    A. The Law of Summary Judgment Generally and the Standard of Review

¶ 136    "A grant of summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and the moving party is clearly entitled to a judgment as a matter of law." *Andrews v. Carbon on 26th, LLC*, 2025 IL 130862, ¶ 20; see

735 ILCS 5/2-1005(c) (West 2022). In determining whether summary judgment is appropriate, the trial court "is not to try an issue of fact but to determine whether a genuine issue of triable fact exists." *Id.* "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. "Summary judgment is a drastic measure that should be granted 'only when the right of the moving party is clear and free from doubt.' " *Andrews*, 2025 IL 130862, ¶ 20 (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)).

¶ 137 Appellate courts review *de novo* a trial court's order granting summary judgment. *Chicago Sun-Times v. Cook County Health & Hospitals System*, 2022 IL 127519, ¶ 24.

¶ 138 B. Layman and Infinity's Motion for Summary Judgment

¶ 139 Plaintiff argues that the trial court erred by granting summary judgment for Layman and Infinity on the basis that Layman did not owe a duty to Rhonda. Specifically, plaintiff contends that Layman owed a duty under a special relationship—namely, an implied patient-physician relationship—because of his roles as "supervising and attending physician, and his role as chair and director of the emergency department."

¶ 140 As an initial matter, we note that on appeal, plaintiff includes arguments based on legal theories not pleaded in the complaint. Specifically, plaintiff argues that Layman breached his duty of care to Rhonda based not only on his being a physician in the emergency room—and therefore directly responsible for Rhonda's care—but also based on his role as "director of the emergency department responsible for ensuring education and quality of care." According to plaintiff, Layman "was under a duty to properly train, or insure [*sic*] proper training of, PAs working in the emergency department so that they would consult with the supervising physician

- 33 -

before discharging a patient with acute neurological symptoms." However, this allegation is wholly new and separate from those stated in the complaint, in which plaintiff alleged Layman "had a duty to act as a reasonably careful board certified emergency medicine physician" and breached that duty by failing to (1) perform a careful neurological examination of Rhonda, (2) recognize she was experiencing symptoms of a stroke, (3) evaluate her for a stroke, (4) carefully communicate with members of the emergency department team, including Gaziano, (5) recognize she should not be discharged based on the erroneous assumption she had experienced only an anxiety attack, and (6) discharge her in a stable condition.

¶ 141　　　　None of the allegations in the complaint include a duty to train Gaziano or ensure his training. Because this claim is not present in plaintiff's complaint, it is improper to raise it for the first time in response to summary judgment, and we do not address this argument on appeal. See *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 36 ("A summary judgment motion is confined to the issues raised in the complaint, and a plaintiff may not raise new issues not pleaded in his complaint to support or defeat a motion for summary judgment."); see also *Filliung v. Adams*, 387 Ill. App. 3d 40, 51-52 (2008) (stating the purpose of a complaint is to define the claims in controversy, and if a party does not seek to amend his complaint, he cannot raise new claims in a summary judgment motion). Accordingly, we address only the claims stated in plaintiff's complaint.

¶ 142　　　　　　　　　　　　　1. *The Applicable Law*

¶ 143　　　　Long ago, the Illinois Supreme Court determined that doctors owe a duty of care only to those plaintiffs with whom they had a physician-patient relationship. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 531 (1987). "The relationship of physician and patient is a consensual relationship in which the patient knowingly seeks the physician's assistance and the physician knowingly accepts the person as a patient." *Gillespie v. University of Chicago*

*Hospitals*, 387 Ill. App. 3d 540, 544 (2008). An exception to this rule exists where a special relationship is formed, which occurs only "where the physician performs specific services for the benefit of the patient." *Mackey v. Sarroca*, 2015 IL App (3d) 130219, ¶ 20. A special relationship giving rise to a duty of care may develop when a physician takes "some affirmative action to participate in the care" of the patient—that is, when a physician has been asked to provide a specific service for the benefit of a specific patient. (Internal quotation marks omitted.) *Donnell v. Nolte*, 2025 IL App (4th) 240593, ¶ 33.

¶ 144                                                2. *This Case*

¶ 145          In the present case, the trial court found that summary judgment was appropriate because "Dr. Layman had no involvement in any aspect of plaintiff's care while she was in the emergency department on July 24, 2015," and the undisputed facts established "that PA Gaziano was the medical provider who treated plaintiff in the emergency department" on that day. In addition, the court rejected plaintiff's claim that the Medical Practice Act (225 ILCS § 60/1 *et seq.* (West 2014)) and the administrative regulations to the Physician Assistant Practice Act (68 Ill. Adm. Code 1350.20, amended at 33 Ill. Reg. 1,484 (eff. Jan. 8, 2009)) gave rise to a duty or imputed liability for Gaziano's acts and omissions to Layman. We agree with the trial court's analysis.

¶ 146                          a. Layman Was Not a Consulting Physician

¶ 147          In his brief on appeal, plaintiff does not seriously discuss any case law supporting his claim that Layman owed a duty to Rhonda given the facts of this case. Instead, he merely cites several cases in passing, essentially for general principles of law, such as *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 85 (1996), *Mackey*, 2015 IL App (3d) 130219, ¶ 20, and *Leonardi v. Loyola University of Chicago*, 262 Ill. App. 3d 411, 415 (1993). On the other hand,

Layman and Infinity address these cases in depth, distinguishing each from the case at hand. In addition, defendants cite *Donnell*, 2025 IL App (4th) 240593, ¶¶ 44-45, and *Dewell v. Hall*, 2024 IL App (2d) 230018-U, ¶ 24, in support of their argument that summary judgment was proper.

¶ 148          In *Reynolds*, 277 Ill. App. 3d at 82, a pediatrician called her neurologist colleague, relayed test results and other pertinent information, and requested his advice on what to do next. The defendant neurologist recommended "a spinal tap to determine whether meningitis, encephalitis, or something similar was involved." *Id.* Based on the neurologist's recommendation, a spinal tap was performed. The pediatrician who contacted the neurologist diagnosed an infection. *Id.* at 83. But the child was transferred the next day and diagnosed with a spinal cord injury. *Id.* In *Reynolds*, this court noted that the patient's parents never asked the neurologist to treat their child. *Id.* The neurologist did not examine or treat the child, reach a diagnosis of the child's condition, or bill for any services. *Id.* Accordingly, this court held the neurologist owed no duty to the patient despite the consultation with the pediatrician. *Id.* at 85.

¶ 149          In *Mackey*, 2015 IL App (3d) 130219, ¶ 3, the patient's attending physician in the emergency department ordered diagnostic tests that revealed a large kidney stone. Per hospital protocol, the attending physician formally consulted the hospital's on-call urologist, a physician who specialized in treating patients with urologic conditions such as kidney stones. *Id.* ¶¶ 3-6. The attending physician testified, "[O]nce the on-call specialist has been contacted, the specialist 'takes over decision making whether to do this or that.' " *Id.* ¶ 6. The urologist directed the attending physician to order Flomax to help the patient pass her kidney stone; the urologist also instructed the attending physician to have the patient follow up with a urologist in his office. *Id.* ¶ 7. "She subsequently developed a severe case of septic shock secondary to urosepsis, disseminated intravascular coagulopathy, adult respiratory distress syndrome, respiratory failure, renal failure,

multisystem organ failure, severe deconditioning, and metabolic encephalopathy." *Id.* ¶ 8. The patient filed a complaint, alleging medical malpractice for the urologist's failure to engage in a course of treatment to prevent septic infection. *Id.* The defendants filed a motion to dismiss, arguing there was no duty, which the trial court granted. *Id.* ¶ 1.

¶ 150        On appeal, the appellate court reversed, concluding that a special relationship was created because the on-call urologist (1) was compensated for his consultation, (2) was consulted by the emergency department physician for the specific purpose of diagnosing and treating the patient, (3) received information about the patient's history, symptoms, and test results, (4) used that information to reach the medical opinion that the patient was not in danger of sepsis and to form a treatment plan, (5) assumed responsibility for the patient's care and recommended specific medication, (6) "was actually responsible for making [the] decision regarding her care and whether she was to be admitted or released," and (7) told the emergency department physician to discharge the patient. *Id.* ¶¶ 7, 27.

¶ 151        In *Leonardi*, 262 Ill. App. 3d at 415, the appellate court held that it was undisputed that the defendant physician was the patient's attending physician and, as such, was primarily responsible for her care. The appellate court wrote the following: "The evidence demonstrated that Dr. Tierney was intricately involved in the care and treatment Mrs. Lopez received. He instructed hospital staff not to operate on her until he arrived. Once there, Dr. Tierney performed the surgery and gave follow-up instructions for Mrs. Lopez's care." *Id.*

¶ 152        None of these cases support plaintiff's argument that a doctor who had no interaction whatsoever with a patient owed a duty to that patient under a physician-patient relationship. The law is clear that, based on Layman's lack of any involvement with Rhonda's care, no reasonable juror could find that Layman was liable for Gaziano's alleged negligence.

¶ 153    The following discussion in *Dewell*, 2024 IL App (2d) 230018-U, ¶¶ 24-25, is directly pertinent to our conclusion:

"In the years since *Reynolds*, courts have applied its standards and made clear the circumstances under which the special physician-patient relationship is established for consulting physicians. This relationship, and the resulting legal duty, is established when 'the consulting physician is assigned the task of consulting as part of established procedures, protocols or contractual obligation with the hospital, is compensated for those consulting services, orders tests or reviews test results, gives specific medical advice regarding contemporaneous patient care, and makes decisions regarding the patient's current medical care.' *Mackey*, 2015 IL App (3d) 130219, ¶ 26 (citing *Bovara*[ *v. St. Francis Hospital*], 298 Ill. App. 3d [1025,] 1032 [(1998)] (duty owed by two cardiac interventionists who were assigned by hospital to review test results and make decision regarding surgical intervention); and *Lenahan*[ *v. University of Chicago*], 348 Ill. App. 3d [155,] 164-65 [(2004)] (duty owed by physician who made decision to admit patient to experimental high-dose chemotherapy program)); see also *Blagden*[ *v. McMillin*], 2023 IL App (4th) 220238, ¶ 60 (duty owed by on-call physician who collaborated with emergency department physician to make decision on the patient's hospital admission); *Slanger v. Advanced Urgent Care*, 2022 IL App (1st) 211579, ¶ 25 (duty owed by supervising emergency department physician who signed off on nurse practitioner's treatment plan).

Conversely, 'where a physician is consulted or advice is sought on an informal basis, where no compensation is received by the consulting physician, the

consulting physician does not order tests or review test results, and has no input in the actual treatment of the patient, no special relationship creating a physician-patient relationship has been established.' *Mackey*, 2015 IL App (3d) 130219, ¶ 26 (citing *Reynolds*, 277 Ill. App. 3d at 85; and *Weiss*[ *v. Rush North Shore Medical Center*], 372 Ill. App. 3d [186,] 189 [(2007)] (no duty owed by on-call psychiatrist who was contacted for follow-up care)); see also *Gillespie v. University of Chicago Hospitals*, 387 Ill. App. 3d 540, 545-46 (2008) (no duty owed by on-call physician who was not actively involved in the patient's treatment or care); *Estate of Kundert v. Illinois Valley Community Hospital*, 2012 IL App (3d) 110007 (no duty where plaintiff relied on medical advice after calling hospital); *McIntyre*[ *v. Balagani*,] 2019 IL App (3d) 140543-U, ¶ 69 (no duty where defendant doctor had no authority to direct the patient's care and treatment))."

¶ 154 The undisputed facts in this case establish that Layman had no direct involvement in Rhonda's care and treatment on July 24, 2015. At that time, PAs in the SAH emergency department, like Gaziano, had the authority to see and discharge patients independently, using their own clinical judgment on a case-by-case basis to determine if a physician consultation was needed. Consistent with this practice, at no time did Gaziano discuss Rhonda's condition with or consult Layman.

¶ 155 Indeed, the record shows that Layman was not involved in Rhonda's care on July 24, 2015, whatsoever; on that date, Layman was not even aware that Rhonda was a patient at the hospital. Importantly, he did not (1) review any test results or medical records, (2) make any orders or recommendations, or (3) speak to anyone about her treatment. His sole interaction with anything to do with Rhonda's care was signing off on her chart on July 25, 2015, *after* she had already been

discharged, readmitted to the hospital, and diagnosed with a stroke.

¶ 156    Plaintiff grasps at evidence of Layman's roles as an attending physician, his designation as the supervising physician, and his appointment as the emergency department director for his argument that Layman was responsible for Rhonda's care, but these facts alone are far too attenuated to constitute a direct physician-patient relationship for the care provided.

¶ 157    We note that although the facts in the present case bear a superficial resemblance to the facts in *Slanger*, 2022 IL App (1st) 211579, ¶ 25, that case is distinguishable. In *Slanger*, the evidence showed that before a patient could be discharged, the treatment plan had to be approved by the supervising physician. *Id.* ¶ 20. After the patient was treated by the nurse, the physician reviewed her medical chart and opined that her medical care was " 'reasonably appropriate,' " that no further medical tests or imaging studies were required, and that the patient's discharge plan was appropriate. *Id.*

¶ 158    Here, as we already stated, Layman was not required to sign off on Rhonda's discharge; he had no role in Rhonda's treatment or discharge plan other than indicating his opinion, after the fact, that Gaziano acted appropriately. The case law we have discussed makes it clear that Layman's limited action in reviewing paperwork the day after Gaziano provided treatment does not amount to direct care that creates a physician-patient relationship.

¶ 159            b. No Statute Imposed a Duty on Layman

¶ 160    Plaintiff's other argument—that Layman had a statutory duty to Rhonda by virtue of his status as supervising physician—is equally unavailing. The Illinois Administrative Code defines a supervising physician as "a physician licensed to practice medicine in all of its branches under the Medical Practice Act and who is the primary supervising physician of the [PA] in accordance with Section 4(7) of the [Physician Assistant Practice] Act." 68 Ill. Adm. Code

1350.20, amended at 33 Ill. Reg. 1484 (eff. Jan. 8, 2009). Plaintiff centers his argument on the following text from the Physician Assistant Practice Act:

"3. *** A [PA] may perform such procedures within the specialty of the supervising physician, except that such physician shall exercise such direction, supervision and control over such [PAs] as will assure that patients shall receive quality medical care. *** A [PA], acting as an agent of the physician, shall be permitted to transmit the supervising physician's orders as determined by the institution's by-laws, policies, procedures, or job description within which the physician/[PA] team practices.

* * *

7. 'Supervising Physician' means *** the primary supervising physician of a [PA], who, within his specialty and expertise may delegate a variety of tasks and procedures to the [PA]. Such tasks and procedures shall be delegated in accordance with a written supervision agreement. *The supervising physician maintains the final responsibility for the care of the patient and the performance of the [PA].*" (Emphasis added.) 225 ILCS 95/4(3), (7) (West 2014).

¶ 161    The allure of this section to plaintiff's argument is clear. However, plaintiff has not cited, and we have not been able to locate, any case in which a court has held that a physician may be liable based purely on his or her status as a supervising physician, likely due to the following language from the Medical Practice Act, which plaintiff fails to address in his argument:

"(e) A physician shall not be liable for the acts or omissions of a prescribing psychologist, [PA], or advanced practice nurse solely on the basis of having signed

a supervision agreement or guidelines or a collaborative agreement, an order, a standing medical order, a standing delegation order, or other order or guideline authorizing a prescribing psychologist, [PA], or advanced practice nurse to perform acts, unless the physician has reason to believe the prescribing psychologist, [PA], or advanced practice nurse lacked the competency to perform the act or acts or commits willful and wanton misconduct." 225 ILCS 60/54.5(e) (West 2014).

¶ 162    Plaintiff makes no argument to refute this limitation of liability. In fact, somewhat curiously, plaintiff does not discuss this section in his brief on appeal. Nothing in the record shows that Layman had any reason to believe that Gaziano lacked any competency to treat patients suffering a stroke who entered the emergency department. For the aforementioned reasons, we are not persuaded that Layman had a physician-patient relationship with Rhonda. Further, we conclude that none of the statutes and regulations plaintiff relies on impose a duty or direct liability on Layman for Gaziano's actions or omissions. Accordingly, we conclude that the trial court did not err by granting summary judgment in Layman's favor. In addition, we note that because Layman owed no duty to Rhonda, Layman's employer cannot be held vicariously liable by extension.

¶ 163                        C. SAH's Motion for Summary Judgment

¶ 164    Plaintiff argues that the trial court erred by granting summary judgment in favor of SAH on the issue of vicarious liability for Gaziano's and Layman's actions because Rhonda's condition when she arrived at SAH creates a question of material fact regarding whether she knew or should have known that Layman and Gaziano were not hospital employees. Specifically, plaintiff argues that the court placed too much emphasis on Rhonda's signing of the consent for treatment form, which disclaimed Layman and Gaziano as SAH employees. We agree with plaintiff.

- 42 -

¶ 165                    1. *Vicarious Liability of Hospitals Generally*

¶ 166          Under the legal theory of vicarious liability, also known as *respondeat superior*, an employer or principal is liable for the torts of its employees or agents that are committed within the scope of their employment. *Vancura v. Katris*, 238 Ill. 2d 352, 375 (2010); *Carroll v. Community Health Care Clinic, Inc.*, 2017 IL App (4th) 150847, ¶ 37. In such a case, the liability of the employee or agent is imputed to the employer or principal, without the need to prove any separate wrongdoing or malfeasance. *Vancura*, 238 Ill. 2d at 375.

¶ 167          Under *respondeat superior*, a principal will be liable not only for the authority that it *actually* gives to another, but also for the authority that it *appears* to give. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523 (1993). This latter doctrine is known as apparent authority. *Id.*

¶ 168          In essence, apparent authority is the authority "a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Id.* When the principal creates the appearance of authority, it cannot then deny agency " 'to the prejudice of an innocent party, who has been led to rely upon the appearance of authority in the agent.' " *Id.* at 524 (quoting *Union Stock Yard & Transit Co. v. Mallory, Son & Zimmerman Co.*, 157 Ill. 554, 565 (1895)).

¶ 169          A hospital will be held liable for the tortious acts of medical personnel when those individuals are its apparent agents. *Id.* at 523.

¶ 170          To prevail on a claim of apparent agency against a hospital under the doctrine of apparent authority, a plaintiff must show the following: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was the hospital's employee or agent; (2) when the acts of the agent create the

appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in those acts; and (3) the plaintiff relied upon the conduct of the hospital or its agent, consistent with ordinary care and prudence. *Id.* at 525.

¶ 171    The first two elements are typically referred to as "holding out," and the third element is typically called "justifiable reliance." (Internal quotation marks omitted.) *Yarbrough v. Northwestern Memorial Hospital*, 2017 IL 121367, ¶ 38. "If [a] plaintiff can prove these elements, the hospital will be held vicariously liable for the negligent acts of a physician 'regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor.' " *Hammer v. Barth*, 2016 IL App (1st) 143066, ¶ 22 (quoting *Gilbert*, 156 Ill. 2d at 524).

¶ 172                                         2. *The Actual Agency Claim*

¶ 173    In the trial court, SAH moved for summary judgment on the issue of actual agency, arguing that Layman and Gaziano were in fact employees of Infinity—not SAH—and SAH did not exercise sufficient control over them to imply agency. The court agreed and granted summary judgment, writing as follows:

> "Actual agency may be either express or implied. *** It is undisputed that Dr. Layman and PA Gaziano were not express agents of SAH, as they were not employees of the hospital, but rather independent contractors employed by [Infinity]. Instead, plaintiff contends that they were implied agents of the hospital. ***
>
> In determining whether an implied agency relationship existed, we look first to the agreement between SAH and [Infinity]. That agreement indicates the clear intent of the parties to maintain an independent relationship between the hospital

and Infinity physicians and physician extenders. The agreement provides that the group physicians and physician extenders 'will at all times be acting as independent contractors [and] will not be considered as employees of the Hospital for any purpose.' *** There is no term in the contract that gives SAH any rights to control either Dr. Layman or PA Gaziano's exercise of medical judgment or daily patient care decisions. With regards to PA Gaziano, the Physician Extender Agreement provides that he 'shall have the full power and authority to determine the manner in which [he] shall provide his medical services.' Looking to the conduct of the parties, both Dr. Layman and PA Gaziano were hired and paid by Infinity. PA Gaziano was trained by Infinity and supervised by Infinity physicians. Dr. Layman had responsibility for patient care in the emergency department. There is no specific evidence that plaintiff points to of control that the hospital exerted over Dr. Layman or PA Gaziano's exercise of medical judgment or daily patient care decisions.

\* \* \*

Plaintiff bears the burden of establishing an agency relationship, and to survive summary judgment must present enough evidence from which a jury could find that such a relationship existed. But the record before the court, as a matter of law, does not support a finding that SAH retained control over the manner in which Dr. Layman and PA Gaziano exercised their medical judgment and provided day-to-day medical care to patients such that an implied agency relationship existed between them and the hospital. Rather, the case law clearly establishes that the factors plaintiff relies on as evidence of control are insufficient to negate their independent contractor status, and SAH is entitled to summary judgment on the

issue of actual agency."

¶ 174    On appeal, plaintiff does not seriously challenge the trial court's conclusion, other than to make a passing reference to it. To the extent plaintiff is challenging the court's decision, we note our agreement with the court's analysis. There is simply no evidence supporting a claim that Layman and Gaziano were implied agents of SAH.

¶ 175    3. *The Apparent Authority Claim*

¶ 176    Plaintiff argues that genuine questions of material fact exist regarding the apparent agency of Gaziano and Layman—namely, (1) SAH's holding out and (2) Rhonda's justifiable reliance. After reviewing the record before us and construing the evidence strictly against SAH and liberally in favor of plaintiff, as we must, we conclude that genuine issues of material fact exist on both the "holding out" and "justifiable reliance" elements of plaintiff's apparent agency claim. Accordingly, we conclude the trial court erred by granting summary judgment regarding this claim.

¶ 177    a. Holding Out

¶ 178    In this case, the trial court found that plaintiff could not meet the holding out element of apparent agency. The court based that conclusion primarily on Rhonda's signing of the consent form on July 24, 2015, along with the previous consent forms she had signed. In forming its conclusion, the court focused on what it viewed as the clear notice in the consent form that Rhonda signed, which stated that the individuals who would be treating her were independent contractors. However, as we discuss, a signed consent form is only one piece of evidence, albeit an important one, to consider when determining whether the holding out element of apparent agency can be met.

¶ 179    We conclude that given the particular circumstances of this case—namely, (1) the patient's condition when she presented to the emergency department and (2) the form and language

of the disclaimer at issue—genuine issues of material fact exist regarding SAH's holding out that must be left for a jury to decide.

¶ 180                                    i. *The Law Regarding Holding Out*

¶ 181          To satisfy the "holding out" element on the part of the hospital, the plaintiff need not show an express representation by the hospital that the person alleged to be negligent is an employee. *Gilbert*, 156 Ill. 2d at 525. "Rather, the element is satisfied if the hospital holds itself out as a provider of emergency room care without informing the patient that the care is provided by independent contractors." *Id.* In many cases, a signed consent form notifying a patient of the physicians' independent status can be a dispositive factor, overriding other factors that might suggest a "holding out," such as misleading hospital advertising. See *Prutton v. Baumgart*, 2020 IL App (2d) 190346.

¶ 182          Given the strong evidentiary value of a signed consent form to rebut a hospital's "holding out," the adequacy of a consent form to entitle a hospital to summary judgment on vicarious liability has been discussed in numerous cases, which both SAH and plaintiff cite. The case law surrounding the effectiveness of a hospital's consent form to disclaim apparent agency can be grouped into five categories of factors to consider: (1) the language and clarity of the disclaimer, (2) the form, presentation, and prominence of the disclaimer, (3) the circumstances of the consent form's signing, (4) the patient's history with the hospital, and (5) representations by the hospital and patient interactions.

¶ 183                                    (a) The Language of the Disclaimer

¶ 184          The first and often the most important factor in determining the effectiveness of an employment disclaimer in a consent form is the wording of the disclaimer itself. The disclaimer must be clear, concise, and unequivocal, and language stating that "all physicians" or "none of the

physicians" are employees or agents of the hospital is often highly effective. See *Delegatto v. Advocate Health & Hospitals*, 2021 IL App (1st) 200484, ¶¶ 34-36 (noting that the consent form contained disclaimed agency of " 'all physicians' "); *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 30 ("Here, in contrast, the language is much clearer and uses the term 'independent physicians' and states that 'none of the physicians who attend to me at the hospital are agents or employees of the hospital.' "); *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790, ¶ 59 ("[Plaintiff] signed multiple consent forms, each of which explicitly stated that 'all physicians providing service to me, including *** my attending physician *** are independent medical staff physicians and not employees or agents of Palos Community Hospital.' ").

¶ 185            On the other hand, forms containing disclaimers that use equivocal terms like (1) "some or all" of the physicians are not employees or agents or (2) nonemployee physicians "may include" those practicing in the listed medical specialties may be ambiguous and insufficient to defeat an apparent agency claim as a matter of law. See *Hammer*, 2016 IL App (1st) 143066, ¶ 24 ("The form states that '*some or all* of the physicians who provide medical services' at the hospital 'are not employees or agents of the hospital, but rather independent practitioners.' *** It further states that '[n]on-employed physicians *may* include, but are not limited to, those practicing emergency medicine, trauma, cardiology, obstetrics, surgery, radiology, anesthesia, pathology and other specialties.' " (Emphases in original.)).

¶ 186            Conflicting information within the consent form likewise reduces the effectiveness of the disclaimer, such as a form containing one paragraph stating, " 'I am aware that during my visit *** hospital employees will attend to my medical needs as may be necessary' " and another paragraph stating, " 'I understand that the Emergency Department physician and my attending

physician are independent contractors and not agents or employees ***. *** I am also aware that any other physicians who may be called to attend my care are independent contractors and not employees or agents ***.' " *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826, 829, 836-38 (2009). In general, intermixing language about personnel who are employees with language stating physicians are independent contractors decreases the effectiveness of the disclaimer. See *Schroeder v. Northwest Community Hospital*, 371 Ill. App. 3d 584, 589 (2006).

¶ 187          Specifically naming the physician's specialty—such as "cardiologists" or "anesthesiologists"—as being among the independent contractors can strengthen the disclaimer (provided the disclaimer does not use language such as "may include" (emphasis and internal quotation marks omitted) (*Hammer*, 2016 IL App (1st) 143066, ¶ 24)). See *Brown v. Mercy Hospital & Medical Center*, 2021 IL App (1st) 200834-U, ¶ 35 ("The consent form's specific reference to the subgroups listed, to which Drs. Kumar and Jones undeniably belong (in any one of three ways), erases any internal inconsistency."); *Churkey v. Rustia*, 329 Ill. App. 3d 239, 244 (2002) (noting the importance of the consent form specifically naming the physicians practice group as an independent contractor).

¶ 188                    (b) The Form of the Disclaimer

¶ 189          Second, the form of and manner in which the disclaimer is presented in a document or documents signed by the patient is important to evaluating the disclaimer's effectiveness. Disclaimers are more effective when they are prominent, such as being printed in bold, capitalized text. See generally *Delegatto*, 2021 IL App (1st) 200484; *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558; *Stelzer v. Northwest Community Hospital*, 2023 IL App (1st) 220557-U. A disclaimer is stronger if it is located directly above the signature line or requires the patient's separate initials, thereby drawing specific attention to the disclaimer. It is less effective if the disclaimer is "buried"

within a lengthy, multiparagraph document in a small font. See *Williams v. Tissier*, 2019 IL App (5th) 180046, ¶¶ 11, 39 (explaining that a disclaimer being written in size eight font and intermixed in multiple paragraphs severely reduced its effectiveness); *Delegatto*, 2021 IL App (1st) 200484, ¶¶ 43-44.

¶ 190　　　　A simple, one-page form with a clear disclaimer is more effective than a lengthy, multipart form that covers many unrelated topics, which can be deemed confusing. See *Spiegelman*, 392 Ill. App. 3d at 837 ("[T]he consent utilized a multipart format and contained various provisions unrelated to the independent contractor disclaimer."); *Schroeder*, 371 Ill. App. 3d at 587 (same). Likewise, a single disclaimer provision contained in just one of many forms a patient must sign can reduce its effectiveness. See *Williams*, 2019 IL App (5th) 180046, ¶ 46 ("[P]laintiff signed several different types of St. Elizabeth's consent forms. Of these different forms, only the Consent for Treatment form included the 'independent contractor' language. The others did not.").

¶ 191　　　　　　(c) The Circumstances of the Patient's Signing the Disclaimer

¶ 192　　　　Third, the context and timing in which the form containing the disclaimer is signed can affect its weight in the "holding out" analysis. To be effective, the form must be presented at a "meaningful time," giving the patient a realistic opportunity to seek care elsewhere. *Brayboy v. Advocate Health & Hospital Corp.*, 2024 IL App (1st) 221846, ¶¶ 30, 36. A form provided hours after a patient has been admitted to an emergency department and treatment of the patient has already begun may be found to offer only an "illusory" choice. *Id.* ¶ 41.

¶ 193　　　　In addition, a patient's medical condition—for example, severe pain, distress, or confusion—is a relevant factor to consider when determining whether the consent form is effective. See, *e.g.*, *Spiegelman*, 392 Ill. App. 3d at 837 (reversing summary judgment in favor of

the hospital and noting that the "plaintiff had complained of dizziness and problems with her vision, and there was evidence that plaintiff's condition rapidly worsened"); *Brayboy*, 2024 IL App (1st) 221846, ¶ 41 (noting the condition of the plaintiff's minor child, who was a patient, and the circumstances of plaintiff's seeking treatment). However, a patient's condition does not automatically nullify a signed consent form containing a disclaimer because a competent adult is charged with the knowledge of what he or she signed. See *Frezados v. Ingalls Memorial Hospital*, 2013 IL App (1st) 121835, ¶ 24 ("[W]e cannot hold that this pain could excuse him from reading the form prior to signing, or from having someone else sign the form if he was unable to consent due to his condition."); *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 121 ("[T]he terms of Provena's consent form and [the patient's] assent to them are not negated by her failure to read the document.").

¶ 194        Illiteracy or a lack of English proficiency does not excuse a patient from the terms of a signed consent form. *Mizyed*, 2016 IL App (1st) 142790, ¶ 55. The law imposes a duty on the person signing to have the document read to him or her if that person is unable to do so himself or herself. See *id.* ¶ 54 ("[O]ne who signs a document is charged with knowledge of its contents, regardless of whether he or she actually read the document."). The standard is objective constructive notice, not subjective understanding. See *Steele*, 2013 IL App (3d) 110374, ¶¶ 138-39.

¶ 195                    (d) The Patient's History With the Hospital

¶ 196        Fourth, a patient having signed identical, unambiguous consent forms on multiple prior visits is strong evidence that the patient knew or should have known of the physician's independent status and can be a dispositive factor. See *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1089-90 (2009) (affirming the entry of summary judgment when

the patient had signed the same consent form four times before and no evidence in the record suggested that she was confused or did not sign the most recent fifth consent form); *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 30 ("After signing *nine* forms containing the aforementioned clear disclosure statement in bold, capitalized print, we find that decedent knew or should have known that Doctor Burke was an independent contractor at the time she sought treatment from her at St. James." (Emphasis in original.)). But see *Schroeder*, 371 Ill. App. 3d at 593-94 (reversing summary judgment when the decedent had signed similar forms on two prior admissions to the hospital, but his wife signed the form on his last admission, which resulted in the alleged negligent acts).

¶ 197          (e) Representations by the Hospital and Patient Interactions

¶ 198          Hospital advertisements and other affirmative representations may diminish the effectiveness of a disclaimer. See *Williams*, 2019 IL App (5th) 180046, ¶ 51 ("The fact that Dr. Tissier's office was located in the St. Elizabeth's building and that he was advertised by St. Elizabeth's on its website further supports plaintiff's contention that there are genuine issues of material fact regarding the 'holding out' element of apparent agency."). But see *Stelzer*, 2023 IL App (1st) 220557-U, ¶ 31 ("[W]e have held that a signed consent form like the one at issue here, which clearly and unambiguously informs a patient that the physicians working at the hospital were independent contractors and not employees, supersedes misleading advertising.").

¶ 199          Medical personnel name badges or scrubs bearing the hospital's logo or name can weigh against notice from an ambiguous disclaimer. See *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 197 (2006) ("[T]he fact that Dr. El-Ganzouri wore scrubs and a lab coat with Rush insignia, as well as the lack of notice of Dr. El-Ganzouri's independent-contractor status in the treatment consent form signed by plaintiff, *** support[ed]

- 52 -

the conclusion that plaintiff did not know, and had no reason to know," the doctor's employment status."); *Davis v. Ingalls Health System*, 2018 IL App (1st) 171696-U, ¶ 20 (holding that the ID badge worn by the physician and bearing the name of the hospital created a question of material fact despite the consent form's disclaiming employment).

¶ 200                                    ii. *This Case*

¶ 201        As an initial matter, we emphasize that we undertake our analysis regarding this matter through the lens of summary judgment, which we reiterate "is a drastic measure that should be granted 'only when the right of the moving party is clear and free from doubt.' " *Andrews*, 2025 IL 130862, ¶ 20 (quoting *Purtill*, 111 Ill. 2d at 240). We view the record provided here in the light most favorable to plaintiff, who is challenging the trial court's grant of SAH's motion for summary judgment. *Id.*

¶ 202        Looking at the five categories of factors we set forth earlier—namely, (1) the language and clarity of the disclaimer, (2) the form, presentation, and prominence of the disclaimer, (3) the circumstances surrounding the consent form's signing, (4) the patient's history with the hospital, and (5) representations by the hospital and patient interactions (see *supra* ¶¶ 183-99)—we conclude that the consent form at issue here was ineffective to disclaim liability for the purpose of summary judgment given the totality of the circumstances, particularly, the circumstances surrounding the consent form's signing.

¶ 203     We again set forth the disclaimer provision of the consent form in the following excerpt of the scanned document.

MCKINNIE, RHONDA M000667326

SwedishAmerican:A Division of UW Health
1401 E. State St. Rockford, IL 61104-2298

MCKINNIE, RHONDA
DOB: 09/01/1977
L00133168484          M000667326
ED                    815 980-0542
07/24/15    PRIM INS : MCR-B

POOR ORIGINAL

THIS IS AN ALL-INCLUSIVE FORM PERTAINING TO INPATIENTS, OUTPATIENTS AND EMERGENCY SERVICES. SECTION F APPLIES TO MEDICARE PATIENTS ONLY.

A. CONSENT FOR GENERAL MEDICAL TREATMENT

'I' or 'Me' or 'My', meaning either myself or a person for whom I have authority to consent to treatment, requests and consents to diagnostic and therapeutic care and treatment at SwedishAmerican Hospital and SwedishAmerican Health System (hereinafter SwedishAmerican Hospital/Health System'). I additionally authorize my physician, my provider, or their designee(s) to administer or order routine diagnostic and therapeutic services. I consent to medical, nursing and allied health students and residents to participate in my treatment. I recognize that medicine is not an exact science and acknowlege that no guarantees have been or can be made to me regarding the likelihood of success or treatment outcome of any diagnosis, test, surgery or examination.

B. NOTICE:INDEPENDENT,NON-EMPLOYEE STATUS OF PHYSICIAN,PROVIDERS,STUDENTS, AND RESIDENTS

THE FOLLOWING INDEPENDENT HEALTHCARE PROVIDERS ARE NOT EMPLOYEES OR AGENTS OF SWEDISHAMERICAN HOSPITAL, SWEDISHAMERICAN HEALTH SYSTEM, OR ANY OF ITS AFFILIATED ENTITIES:

All Emergency Department Physicians          All Pathologists
All Emergency Department Nurse Practitioners  All Radiolgists
All Emergency Department Physician Assistants All Cardiologists
All Anesthesiologists                         All Certified Nurse Anesthetist(CRNA's)
All Residents in Training                     All Medical Students
All Individuals With a White Background on Their Security Badge

Any person whose Lab Coat, Clothing or Security Badge Includes a Name Other Than SwedishAmerican, including but not limited to such names as Rockford Surgical Services, RSS, Infinity Healthcare Physicians, Eagle Hospitalists, Rockford Gastroenterology Associates, RGA, and Surgical Associates of Northern Illinois.

Patient initials __R.M.__

With regard to other physicians, physician specialties, and providers not contained in the list immediately above this paragraph, I understand and recognize, that with limited exceptions, the physician/provider furnishing services ARE NOT EMPLOYERS OR AGENTS OF SWEDISHAMERICAN HOSPITAL, SWEDISHAMERICAN HEALTH SYSTEM, OR AFFILIATED ENTITIES.

Should the employment or agency status of any such physician or provider be important to me or should I be relying on any appearances of employment/agency status, I understand that I may check with the SwedishAmerican Hospital Administrative Offices on the first floor(phone 815 489-4002) to determine whether any named or (unnamed) physician or provider is an employee/agent. I agree that I am on notice that I should presume that any physician or provider is not an agent or employee unless I have checked with the Administrative Office and have been informed that the physician or provider is an employee or agent.

A. CONSENT

Patient Consent/Assignment Form
SSAD-0200 1/10/14
Page 1 of 4

¶ 204                    (a) The Language and Clarity of the Disclaimer

¶ 205       First, although not perfect, the language in the consent form is fairly clear that the medical providers giving treatment were presumably independent contractors. The notice (1) names specific categories of doctors and staff (see *Brown*, 2021 IL App (1st) 200834-U, ¶ 35 ("The consent form's specific reference to the subgroups listed, to which Drs. Kumar and Jones undeniably belong (in any one of three ways), erases any internal inconsistency.")) and (2) states "all" regarding each of those categories (see *Delegatto*, 2021 IL App (1st) 200484, ¶¶ 34-36 (noting that the consent form disclaimed agency of " 'all physicians' ")). However, the disclaimer also contains language, located in the very next paragraph, that suggests that there are limited exceptions to the disclaimer.

¶ 206       The disclaimer itself also suggests that patients should look at the providers' nametags for the color and names of organizations other than SAH to discern employment. In addition, the language in the second paragraph after the disclaimer instructs that to be sure of who is and who is not an employee, the patient must call SAH's administrative offices to verify the provider's employment status.

¶ 207             (b) The Form, Presentation, and Prominence of the Disclaimer

¶ 208       Second, the structure and the presentation of the independent contractor disclaimer creates significant ambiguity. On the first page of the consent form, the document first presents the section in which the signatory authorizes general medical treatment, although no signature line appears there. Immediately following this crucial paragraph is the disclaimer—a notice of likely far lesser significance to a patient in that moment. Although the disclaimer is in bold type, it is in the same small font as all the other text and is immediately followed by the only line for initials on that page.

¶ 209 Given that up to this point, the consent for medical treatment section contains the only language written in the first person and requiring the patient's signature, a reasonable person could believe that initialing the lone signature line on the first page acknowledges the acceptance of treatment, not the disclaimer. Indeed, a person may not even read the entire disclaimer before signing, given its confusing structure: the initials line physically interrupts the disclaimer section, which continues onto the next page, and the disclaimer's typeface differs from the consent section (which is not in bold text), visually detaching the notice from the act of initialing.

¶ 210 The ambiguity is compounded by the placement of the second initials line. The second page and the second signature line appear as follows:



¶ 211 This second line for the patient's initials appears after the paragraph informing the patient that SAH is a teaching hospital and any medical residents present are also not SAH employees. The existence of this second acknowledgment suggests that the first initials line was not intended for the patient to acknowledge the employment status disclaimer.

¶ 212 The second initials line creates its own confusion. Because the second initials line directly follows a separate notice, also in bold, regarding students and residents, it is unclear whether this second set of initials is meant to acknowledge the independent contractor disclaimer

from the preceding page or is solely for the notice about students and residents. This confusing structure further demonstrates the document's overall ambiguity.

¶ 213 Even if we assumed, for argument's sake, the consent form at issue was a model of clarity, the third category of factors—the circumstances surrounding the consent form's signing—weighs strongly against the consent form's effectiveness at disclaiming vicarious liability for SAH premised on apparent agency.

¶ 214 (c) The Circumstances Surrounding the Consent Form's Signing

¶ 215 Quoting *York*, 222 Ill. 2d at 202, SAH argues that "[case] law squarely holds that when *** a patient is 'informed' and provided actual or constructive 'notice in a signed unambiguous consent form of the physicians' 'independent status,' he/she is 'foreclosed' from recovering against the hospital for the conduct of those physicians on an apparent agency theory." SAH cites numerous cases stating that constructive notice is all that is necessary to defeat the holding out element (see *id.*) and that physical or emotional distress (*Frezados*, 2013 IL App (1st) 121835, ¶ 24) or an inability to understand English (*Mizyed*, 2016 IL App (1st) 142790, ¶¶ 50, 54) does not defeat constructive notice.

¶ 216 Although we agree with the general propositions of law SAH sets forth, the value of the disclaimer is not that it simply provides some level of notice of the independent status of medical staff to the patient. Instead, the value of the disclaimer is that it is given in such a way as to adequately repudiate the representations that the hospital may have already made by holding out medical staff as its employees. In other words, the disclaimer must be presented to the patient in a manner that ensures "the patient knows, or should have known, that the physician is an independent contractor." *Gilbert*, 156 Ill. 2d at 524.

¶ 217 Inherent in the supreme court's adoption of apparent agency to recover against a

hospital for the negligence of independent contractors is the strong societal presumption that patients view doctors and emergency department staff as employees of the hospital, who are ultimately answerable to the institution itself. See *Delegatto*, 2021 IL App (1st) 200484, ¶ 39 (" 'Hospitals hold themselves out to the public as providing a broad range of services, including medical care and treatment. Thus, patients tend to assume that hospital physicians, such as emergency room specialists, radiologists, anesthesiologists, and pathologists function as an integral part of the hospital enterprise.' " (quoting 22 Robert John Kane & Lawrence E. Singer, Illinois Practice, The Law of Medical Practice in Illinois § 30:4, at 474 (3d ed. 2021))).

¶ 218　　　　　In *Yarbrough*, the supreme court reiterated the reasoning underlying *Gilbert* related to the realities of modern hospitals—namely, the business model and the reasonable expectations of the public—as follows:

> "In rejecting appellate court decisions that had refused to impose vicarious liability upon a hospital based upon an agency relationship unless the physician was an actual agent of the hospital, we held those decisions overlooked two realities of modern hospital care. [Citation.] First, those appellate court decisions overlooked the business of a modern hospital. [Citation.] We recognized:
>
> > [H]ospitals increasingly hold themselves out to the public in expensive advertising campaigns as offering and rendering quality health services. One need only pick up a daily newspaper to see full and half page advertisements extolling the medical virtues of an individual hospital and the quality health care that the hospital is prepared to deliver in any number of medical areas. Modern hospitals have spent billions of dollars marketing themselves, nurturing the image with the consuming public that they are

full-care modern health facilities. All of these expenditures have but one purpose: to persuade those in need of medical services to obtain those services at a specific hospital. In essence, hospitals have become big business, competing with each other for health care dollars. [Citation.]

The second reality of modern hospital care discussed by this court in *Gilbert* involved the reasonable expectations of the public. [Citation.] We stated:

[G]enerally people who seek medical help through the emergency room facilities of modern-day hospitals are unaware of the status of the various professionals working there. Absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians he will use while there, it is the reputation of the hospital itself upon which he would rely. Also, unless the patient is in some manner put on notice of the independent status of the professionals with whom [he] might be expected to come into contact, it would be natural for him to assume that these people are employees of the hospital." (Internal quotation marks omitted.) *Yarbrough*, 2017 IL 121367, ¶¶ 23-24 (quoting *Gilbert*, 156 Ill. 2d at 519-21).

¶ 219    Accordingly, patients enter a hospital with the reasonable expectation that the institution itself, acting through its staff, will provide for their healthcare needs. When that care is negligent, the patient may recover against the hospital for the negligence of its apparent agents. As the supreme court has explained, the apparent authority doctrine itself " 'functions like an estoppel' and '[w]here the principal creates the appearance of authority, a court will not hear the principal's denials of agency to the prejudice of an innocent third party, who has been led to reasonably rely

upon the agency and is harmed as a result.' " *Id.* ¶ 33 (quoting *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999)).

¶ 220    The supreme court's policy on this matter recognizes two corresponding principles: first, that hospitals receive a tangible financial benefit by attracting patients to their facilities, and second, that patients who are injured after justifiably relying on a hospital's representation of comprehensive care via medical staff ought to be able to recover for their injuries. In other words, a hospital cannot benefit from the appearance of an employer-employee relationship and then simultaneously avoid the liability that would otherwise arise from that beneficial appearance based on an undisclosed legal relationship with its medical staff.

¶ 221    This policy is rooted in the foundational principle of vicarious liability, which "is not based upon fault but upon a policy of proper allocation of the risk. As between the master and the innocent third party, the doctrine requires the master to bear any loss for his servant's negligence." *Bristow v. Griffitts Construction Co.*, 140 Ill. App. 3d 191, 198 (1986) (citing Prosser and Keeton on the Law of Torts § 52, at 346 (W. Page Keeton *et al.* eds., 5th ed. 1984)). Accordingly, public policy favors placing the risk on the hospital unless it has given an unambiguous disclaimer to the patient within a meaningful time to seek care elsewhere that it does not have an employer relationship with its physicians. Once that meaningful time has passed, the patient's reliance interest is effectively complete, and the hospital is estopped from disclaiming liability.

¶ 222    This meaningful time requirement for the effectiveness of the disclaimer, which was until recently a matter of first impression in Illinois, was explained in *Brayboy*.

¶ 223    The facts of *Brayboy* provide a clear and helpful illustration of when the meaningful time to disclaim has passed. The evidence in *Brayboy* showed that around 9 p.m., a mother brought

her three-year-old son, who had a high fever and other flu-like symptoms, to a hospital emergency room. *Brayboy*, 2024 IL App (1st) 221846, ¶¶ 1, 7-8. After the sick child was admitted and had already received some initial treatment, the hospital staff gave the mother a three-page, single-spaced consent form. *Id.* ¶¶ 8-9. The form stated, in capital letters, that the hospital used independent contractors for its services. *Id.* ¶ 9. The mother signed the form so that her son's treatment would continue. *Id.* Three days after discharge, the child died from what was diagnosed as an untreated bacterial infection. *Id.* ¶ 12. The mother sued, and the hospital argued that the consent form put her on notice of the independent status of the treating medical providers. *Id.* ¶¶ 13-14. The trial court granted summary judgment on the holding out issue, finding the consent form decisive. *Id.* ¶¶ 14-17.

¶ 224　　　　The appellate court reversed, holding that a question of material fact existed surrounding whether the minor patient's mother had been given a consent form disclaiming the agency of the treating medical providers "in a meaningful way, at a meaningful time, in order to sufficiently disclaim reliance by the patient." *Id.* ¶¶ 30-36, 48. That is to say, "when the patient still has a reasonable opportunity to obtain treatment elsewhere if he or she chooses not to sign the form." *Id.* ¶ 36.

¶ 225　　　　In so holding, the appellate court examined multiple cases from other states as persuasive authority for its reasoning that the disclaimer must be given at a meaningful time. See, *e.g.*, *Clark v. Southview Hospital & Family Health Center*, 628 N.E.2d 46, 54 (Ohio 1994); *Simmons v. Tuomey Regional Medical Center*, 533 S.E.2d 312, 320 (S.C. 2000); *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 152 (Ind. 1999); *Boren v. Weeks*, 251 S.W.3d 426, 434-36 (Tenn. 2008); *Williams v. Dimensions Health Corp.*, 279 A.3d 954, 964 (Md. 2022).

¶ 226　　　　After discussing the reasoning in each of these cases, the *Brayboy* court concluded:

"We agree with these national trends concerning apparent agency law that a notice or consent form, to be effective, must be given when the patient still has a reasonable opportunity to obtain treatment elsewhere if he or she chooses not to sign the form. While the cases may not be binding precedent, they certainly are persuasive." *Brayboy*, 2024 IL App (1st) 221846, ¶ 36.

¶ 227　　　　We agree with the sound analysis of our First District colleagues in *Brayboy*. The principle underlying the *Brayboy* court's "meaningful time" requirement is that estoppel attaches once a patient has justifiably relied on the hospital's representations of agency. Public policy dictates that the hospital, being in the best position to prevent confusion, must bear the risk of that reliance. Therefore, a hospital can only disclaim liability by providing a clear warning about its independent contractors before a patient's reliance interest has reasonably accrued; after that point, the hospital is estopped from denying agency.

¶ 228　　　　In addition, the meaningful time requirement cannot solely be dictated by the literal timing of the form's presentation to the patient because, as *Brayboy* held, the timing of the form must give the patient a genuine opportunity to seek care elsewhere. As such, taking into account (1) *Brayboy*'s holding, (2) the body of case law surrounding consent forms and holding out, and (3) the public policy of the supreme court regarding hospitals and vicarious liability, the meaningful time requirement cannot be limited to the literal timing of the form but is flexible and based on the totality of the circumstances surrounding the signing of the disclaimer.

¶ 229　　　　After reviewing numerous cases regarding this principle, we conclude that the more a hospital holds out medical personnel as its agents, the stronger and clearer its disclaimer of that agency must be. Accordingly, at least in some circumstances, a consent form may simply not be sufficient for a hospital to disclaim agency because the reliance issue has already accrued. For

example, in *Brayboy*, that reliance could not be disclaimed as a matter of law when the mother did not receive the forms until after her very sick three-year-old son had already been admitted, seen by medical staff, and received treatment for nearly two hours. And, in *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶¶ 21-22, that reliance could not be disclaimed by showing a consent form to a patient struggling to breathe and having the patient's son sign after treatment had already begun and after the patient was already brain dead and hypoxic.

¶ 230          Viewing the record before us in the light most favorable to plaintiff, we conclude that a genuine issue of material fact exists regarding whether Rhonda was capable of understanding the consent form she signed upon her arrival. The record contains family testimony that Rhonda was experiencing confusion, a claim supported by her subsequent diagnosis of a stroke—an injury that results in neurological symptoms. Accordingly, a triable issue remains as to whether the form, given her condition, was presented at a meaningful time for her to be put on notice of the independent contractor status of SAH's medical providers and to realistically seek treatment elsewhere.

¶ 231          For a patient suffering from an emergent condition like a stroke, the meaningful time to disclaim agency may pass the moment she enters the emergency department and submits to care. Realistically, a patient who is experiencing symptoms like those described by Rhonda's family and who is presented with a consent form containing an agency disclaimer is unlikely to leave the emergency room he or she has gone to and seek treatment at another emergency room, even if one is available. We make this point to demonstrate the fallacy of the notion that an emergent patient has a meaningful opportunity to seek treatment elsewhere; time is of the essence in such situations.

¶ 232    Once a patient with severe symptoms arrives at an emergency department seeking treatment, like Rhonda in the present case, a jury could find that any subsequent disclaimer was not provided at a meaningful time to allow for a realistic choice. Public policy dictates that a hospital cannot hold its doctors out as agents to attract the public and then disclaim liability when a patient's medical condition prevents that patient from comprehending the disclaimer.

¶ 233    An unambiguous consent form may be sufficient to provide notice to a patient who presents with a minor injury. Whether such a form would be sufficient for a patient presenting with a neurological injury, as did Rhonda, is a question of fact for a jury to resolve.

¶ 234                    (d) The Patient's History With the Hospital

¶ 235    SAH places significant weight on prior consent forms Rhonda had signed over the years. The record shows that only one was signed within the year before her stroke; the others were signed on multiple occasions over the prior decade and were not identical to the form Rhonda signed on July 24, 2015.

¶ 236    Evidence of a patient's signing consent forms on previous visits to a hospital can support a finding of constructive notice. See *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 30 ("After signing *nine* forms containing the aforementioned clear disclosure statement in bold, capitalized print, we find that decedent knew or should have known that Doctor Burke was an independent contractor at the time she sought treatment from her at St. James." (Emphasis in original.)). Nevertheless, whether those prior consent forms were sufficient to provide notice can remain a question of material fact. See *Schroeder*, 371 Ill. App. 3d at 593-94 (reversing summary judgment when the decedent had signed similar forms on two prior admissions to the hospital, but his wife signed the form on his last admission, which resulted in the alleged negligent acts).

¶ 237    Here, based on the specific language and form of the disclaimer at issue, coupled

with the significant time that elapsed since Rhonda signed the prior forms, a reasonable jury could conclude that the previous forms failed to provide her with adequate notice.

¶ 238 (e) Representations by the Hospital and Patient Interactions

¶ 239 Plaintiff emphasizes materials outside the evidentiary record—namely, purported advertisements for SAH's emergency department staff—to support his position that SAH actively solicited patients for its emergency department. Because this evidence is not in the record, we will not consider it on appeal. See *Bank of New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 72 ("It is well settled that issues not raised in the trial court are forfeited and may not be raised for the first time on appeal.").

¶ 240 Viewing the record in the light most favorable to the plaintiff, we conclude that a genuine issue of material fact regarding the holding-out element precludes summary judgment. A triable issue remains as to whether SAH held itself out to Rhonda as the provider of her healthcare without informing her, within a meaningful time for her to seek other treatment, that the care was actually provided by independent contractors. Accordingly, we conclude that the trial court erred by granting SAH's motion for summary judgment on this element.

¶ 241 b. Justifiable Reliance

¶ 242 Having concluded that material questions of fact persist regarding SAH's holding out Gaziano as its agent, we discuss the second element for apparent agency—namely, whether Rhonda's reliance on that representation was justifiable.

¶ 243 The trial court found that plaintiff could not satisfy the justifiable reliance element of apparent agency and provided the following explanation in its order granting summary judgment:

"Likewise, plaintiff cannot satisfy the reliance element of apparent

- 65 -

authority. The facts of this case are similar to those in *Wallace v. Alexian Bros. Medical Center*, 389 Ill. App. 3d 1081, 1093-94. In that case, the court found that the plaintiff could not establish reasonable reliance because she was very familiar with the hospital, having been there four times in the preceding four years. One visit had been just a month prior to the time at issue. Each time, she signed identical consent forms which distinctly notified her that the treating physicians were not employees of the hospital, but were independent contractors. Based on that, the court concluded that she could not have relied on the conduct of the hospital or the physicians for a claim of apparent authority. Because she was clearly on notice that the physicians were not employees, any reliance to the contrary would be unreasonable. It is the same in the instant case. [Rhonda] signed at least 12 additional SAH consent forms over a ten-year period prior to July 24, 2015, which all contained language notifying her that the treating physicians were not employees of the hospital. In particular, 11 months prior, on August 28, 2014, [Rhonda] presented to the SAH emergency department and signed a consent form with identical language advising her that the emergency department physicians and physician assistants were not employees of the hospital. Thus, she could not reasonably rely on any conduct by the hospital or physician on the date of the treatment in question, as she was clearly on notice that the emergency department providers were not employees."

¶ 244       SAH argues similarly in its brief, as follows:

"Since its adoption by the Supreme Court in *Gilbert*, the reliance element of the apparent agency analysis has required a plaintiff to plead and prove that he

or she acted in reliance on the defendants' conduct 'consistent with ordinary care and prudence,' *i.e.*, that he or she reasonably relied on the apparent agency between the hospital and the alleged negligent provider. *Gilbert*, 156 Ill. 2d at 525; *Wallace*, 389 Ill. App. 3d at 1093. Plaintiff has not and cannot meet this standard.

       \*\*\*

Like the plaintiff in *Wallace*, Rhonda had the opportunity and discretion to choose which hospital she wanted to go to for her treatment yet did not refuse or object when her mother offered to take her to SAH despite being on actual and/or constructive notice that the physician assistants/physicians who would provide her care were not employees or agents of the hospital. Nor has plaintiff offered any evidence that the employment status of her physician assistant and/or physicians was relevant to her when seeking treatment. \*\*\* Further like the plaintiff in *Wallace*, SAH 'was not a hospital with which [Rhonda] was unfamiliar.' \*\*\* Rhonda had been to SAH at least twice in just the eleven months prior to the admission at issue, and no less than an additional ten times within the preceding ten years. On each occasion, Rhonda initialed and/or signed consent forms plainly informing her—with specificity—that her medical providers were not employees of the hospital \*\*\*. \*\*\* Based on these facts, plaintiff has not and cannot establish that Rhonda reasonably relied, 'consistent with ordinary care and prudence,' on any conduct by SAH, PA Gaziano, and/or Dr. Layman—whom she never even met— in believing an agency relationship existed between her providers and SAH when seeking her treatment."

¶ 245      We note that both the trial court and SAH cited *Wallace* and *Gilbert* as authority

for their conclusions. However, the First District's analysis in *Wallace* regarding justifiable reliance is contrary to the binary test first set forth in *Gilbert*, repeated in *York*, and applied nearly universally in the Illinois Appellate Court. As the supreme court wrote in *Gilbert*, "The element of justifiable reliance on the part of the plaintiff is satisfied if the plaintiff relies upon the hospital to provide complete emergency room care, rather than upon a specific physician." *Gilbert*, 156 Ill. 2d at 525. In *Gilbert*, the court then explained this test by quoting the Wisconsin Supreme Court's decision in *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 857 (Wis. 1988), for the following point:

"  'We agree with these decisions that the critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care—from blood testing to radiological readings to the endless medical support services—will be provided by the hospital through its staff.' "

*Gilbert*, 156 Ill. 2d at 525-26 (quoting *Pamperin*, 423 N.W.2d at 857).

¶ 246    In *York*, the Illinois Supreme Court reaffirmed this precise point, writing as follows:

"With respect to the third element of an apparent agency claim against a hospital, *Gilbert* established that the element of a plaintiff's reliance is satisfied if the plaintiff relies upon the *hospital* to provide medical care, rather than upon a

specific physician. [Citation.] *Gilbert* held that the 'critical distinction' is whether the plaintiff sought care from the hospital itself or looked to the hospital merely as a place for his or her personal physician to provide medical care[.]" (Emphasis in original.) *York*, 222 Ill. 2d at 185.

¶ 247 The test for justifiable reliance could not be more straightforward: A patient either went to the hospital seeking medical care from the hospital itself—thereby relying on the institution for treatment—or the patient went to the hospital specifically to see his or her personal physician who was merely practicing medicine within the hospital building. This test is binary and does not include an analysis of how many times the patient may have previously visited the hospital or the number of consent forms she signed. Although those details might be relevant to the weight the jury gives to testimony that the patient sought to go to the hospital for care rather than a specific provider, credibility assessments and other fact-finding is strictly prohibited when ruling on a motion for summary judgment. *Martin v. State Journal-Register*, 244 Ill. App. 3d 955, 961-62 (1993). Accordingly, we flatly reject SAH's misinterpretation of the justifiable reliance test and instead apply the *correct* standard, as set forth by the supreme court in *Gilbert* and reiterated in *York*.

¶ 248 Considering SAH's motion for summary judgment in the light most favorable to plaintiff, as the nonmoving party (*Illinois Insurance Guaranty Fund v. Priority Transportation, Inc.*, 2019 IL App (1st) 181454, ¶ 53), the record contains no evidence that Rhonda sought medical treatment specifically from Gaziano or Layman. Indeed, the deposition testimony from Rose, Gaziano, and Layman refutes any such assertion. Neither Gaziano or Layman had met Rhonda before her July 2015 emergency department visit, and the testimony supports plaintiff's assertion that Rhonda simply went to the emergency department to receive care from whoever was currently

working in the hospital on that day. Accordingly, the trial court erred when it found that plaintiff could not satisfy the justifiable reliance element of apparent agency.

¶ 249      4. *Summary Judgment Was Inappropriate Regarding SAH's Vicarious Liability Based on Apparent Agency*

¶ 250      Ultimately, we conclude that the trial court erred by granting summary judgment in favor of SAH regarding the issue of apparent authority. Although it is undisputed that Layman and Gaziano were not actual agents or employees of SAH, questions of material fact persist regarding whether they were apparent agents of SAH—namely, whether (1) the consent form Rhonda signed was effective to disclaim SAH's liability given her condition at the time, (2) the consent form was given at a meaningful time, and (3) Rhonda justifiably relied on the hospital for her care.

¶ 251      D. Infinity's Motion for Summary Judgment Regarding Direct Negligence Claims

¶ 252      Plaintiff argues that the trial court erred by granting summary judgment in Infinity's favor on plaintiff's claims that Infinity was directly negligent by failing to implement policies and procedures regarding (1) when a patient may be safely discharged from the emergency department and (2) recognizing the signs and symptoms of a stroke. We disagree.

¶ 253      1. *The Applicable Law*

¶ 254      To succeed on a cause of action for negligence, a plaintiff must allege and prove (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's injuries. *Steed v. Rezin Orthopedics & Sports Medicine, S.C.*, 2021 IL 125150, ¶ 36. The analysis of whether a defendant owed a duty to a defendant is a question of law, which courts undertake as follows:

> "[T]he duty analysis must begin with the threshold question of whether the defendant, by his act or omission, contributed to a risk of harm to this particular

plaintiff. If so, we weigh the four factors to determine whether a duty ran from the defendant to the plaintiff: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. If the answer to this threshold question is 'no,' however, we address whether there were any recognized 'special relationships' that establish a duty running from the defendant to the plaintiff." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 21.

¶ 255  One duty that has been recognized in Illinois is the independent duty of hospitals to assume responsibility for the care of their patients. *Steed*, 2021 IL 125150, ¶ 35. Negligence cases involving this duty are often referred to as institutional negligence, also known as direct corporate negligence. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 291 (2000). "Ordinarily, this duty is administrative or managerial in character." *Id.* "To fulfill this duty, a hospital must act as would a 'reasonably careful hospital' under the circumstances." *Id.* at 291-92 (quoting *Advincula v. United Blood Services*, 176 Ill. 2d 1, 29 (1996)). The supreme court in *Jones* explained as follows:

> "[I]n recognizing hospital institutional negligence as a cause of action, *Darling* merely applied principles of common law negligence to hospitals in a manner that comports with the true scope of their operations. See *Darling*[ *v. Charleston Community Memorial Hospital*], 33 Ill. 2d [326,] 331 [(1965)] (noting that the duty in negligence cases is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk)." *Id.* at 292.

¶ 256  The supreme court also held that this duty extended to HMOs, noting that

underlying the tort of institutional negligence is a recognition of the comprehensive nature of hospital operations today. *Id.* The court explained as follows:

> "HMOs, like hospitals, consist of an amalgam of many individuals who play various roles in order to provide comprehensive health care services to their members. [Citation.] Moreover, because HMOs undertake an expansive role in arranging for and providing health care services to their members, they have corresponding corporate responsibilities as well. [Citations.] Our nationwide research has revealed no decision expressing a contrary view, and Chicago HMO makes no argument against extending the doctrine of institutional negligence to HMOs. Hence, we conclude that the law imposes a duty upon HMOs to conform to the legal standard of reasonable conduct in light of the apparent risk. [Citation.] To fulfill this duty, an HMO must act as would a 'reasonably careful' HMO under the circumstances." *Id.* at 293.

¶ 257 In *Jones*, the HMO's active role involved implementing cost-control protocols and roadblocks to treatment, which led, in part, to a physician's failure to act, resulting in the plaintiff's child's delayed treatment and permanent disability. *Id.* at 282-83. The *Jones* court supported its reasoning of extending institutional negligence to HMOs, in part, by citing a decision of the Pennsylvania Superior Court, *Shannon v. McNulty*, 718 A.2d 828, 835-36 (Pa. Super. Ct. 1998). We likewise deem the following paragraphs from *Shannon* informative to the issue at hand:

> "We recognize the central role played by HMOs in the total health care of its subscribers. A great deal of today's healthcare is channeled through HMOs with the subscribers being given little or no say so in the stewardship of their care. Specifically, while these providers do not practice medicine, they do *involve*

- 72 -

*themselves daily in decisions affecting their subscriber's medical care*. These decisions may, among others, limit the length of hospital stays, restrict the use of specialists, prohibit or limit post hospital care, restrict access to therapy, or prevent rendering of emergency room care. While all of these efforts are for the laudatory purpose of containing health care costs, when decisions are made to limit a subscriber's access to treatment, that decision must pass the test of medical reasonableness. To hold otherwise would be to deny the true effect of the provider's actions, namely, dictating and directing the subscriber's medical care.

Where the HMO is providing health care services rather than merely providing money to pay for services their conduct should be subject to scrutiny. We see no reason why the duties applicable to hospitals should not be equally applied to an HMO when that HMO is performing the same or similar functions as a hospital. When a benefits provider, be it an insurer or a managed care organization, *interjects itself into the rendering of medical decisions affecting a subscriber's care* it must do so in a medically reasonable manner. Here, HealthAmerica provided a phone service for emergent care staffed by triage nurses. Hence, it was under a duty to oversee that the dispensing of advice by those nurses would be performed in a medically reasonable manner. Accordingly, we now make explicit that which was implicit in *McClellan* [*v. Health Maintenance Organization of Pennsylvania*, 604 A.2d 1053 (Pa. Super Ct. 1992),] and find that HMOs may, under the right circumstances, be held corporately liable ***." (Emphases added.) *Id.*

¶ 258                    2. *Comparison of Infinity to a Hospital or HMO*

¶ 259          In the present case, plaintiff alleges that Infinity violated its duty to act as "a

reasonabl[e] medical group" by failing to implement policies and procedures regarding (1) the signs and symptoms of a stroke and (2) when a suspected stroke patient may be safely discharged from the hospital. Plaintiff clarifies that his theory of recovery sounds in institutional negligence, seeking to apply the same duty of care that a reasonably careful hospital has under the circumstances. The trial court interpreted plaintiff's institutional negligence argument as an independent claim improperly raised for the first time in response to Infinity's motion for summary judgment. See *Caulkins*, 2023 IL 129453, ¶ 36 ("A summary judgment motion is confined to the issues raised in the complaint, and a plaintiff may not raise new issues not pleaded in his complaint to support or defeat a motion for summary judgment."); see also *Filliung*, 387 Ill. App. 3d at 51-52 (stating the purpose of a complaint is to define the claims in controversy, and if a party does not seek to amend his complaint, he cannot raise new claims in a summary judgment motion). We, however, do not deem plaintiff's response as inherently inconsistent with the claims raised in his complaint. The alleged duty owed by Infinity to act as a reasonable medical group by implementing certain procedures and policies is essentially the duty to act as a reasonable hospital, and we will therefore address the merits of the claim.

¶ 260        As the Illinois Supreme Court has explained, present-day hospitals are not merely passive venues where independent physicians treat patients; instead, they are comprehensive health care providers responsible for creating, maintaining, and enforcing systems to further patient safety. See *Jones*, 191 Ill. 2d at 292 ("The hospital's expanded role in providing health care services to patients brings with it increased corporate responsibilities."); *Advincula*, 176 Ill. 2d at 28-29 (explaining that the hospital's duty involves " 'not medical expertise, but administrative expertise, to enforce rules and regulations' adopted to ensure [a] smoothly run hospital and adequate patient care") (quoting *Johnson v. St. Bernard Hospital*, 79 Ill. App. 3d 709, 718 (1979)).

They are an "amalgam of many individuals[,] not all of whom are licensed medical practitioners," and their corresponding liability arises from systematic failures that cause or contribute to patient harm. *Greenberg v. Michael Reese Hospital*, 83 Ill. 2d 282, 293 (1980) (citing *Darling*, 33 Ill. 2d at 326). *Darling*, 33 Ill. 2d at 332.

¶ 261 Applying these principles, the supreme court in *Jones* extended this doctrine to HMOs, recognizing that they too play an active role in coordinating and controlling patient care. *Jones*, 191 Ill. 2d at 292. The court reasoned that because HMOs "undertake an expansive role in arranging for and providing health care services," they must bear the same responsibility as a hospital for policies that put patients at risk. *Id.* at 293. In *Jones*, the HMO's active role involved implementing cost-control protocols and roadblocks to treatment, which led, in part, to a physician's failure to act, resulting in the plaintiff's child's delayed treatment and permanent disability. *Id.* at 282-83.

¶ 262 Infinity's role, as revealed by the undisputed facts in this record, is fundamentally different than the role of a hospital or HMO. As a factual matter, Infinity is not a hospital or HMO, and it does not offer comprehensive healthcare services directly to patients; instead, it contractually agrees to staff an emergency department. The agreement between Infinity and SAH makes it clear that while Infinity supplies the personnel, it is the hospital that maintains ultimate control over the environment of care. Infinity's physicians and PAs are required to become members of the hospital's medical staff and are contractually obligated to "observe and comply with [SAH's] reasonable policies and procedures." SAH has sole discretion to admit providers to its staff.

¶ 263 Whereas hospitals and HMOs are greater than the sum of their parts, Infinity, on this record, is effectively no different than the medical providers it employs. It is, in essence, an outsourced human resources department for SAH's emergency room. Indeed, Infinity's agreement

with SAH shows that Infinity avoids making administrative or managerial decisions that could directly affect patients' medical care. For example, each physician is subject to the approval of SAH and required to become a member of SAH's medical staff and follow the bylaws, rules, and regulations of SAH. The hospital agreed to provide space, equipment, and personnel. Although Infinity agreed to appoint a medical director to work with and at the direction of SAH to help develop policies and procedures, among other things, "the final decisions on these matters, as well as general administrative control over such personnel," rested with SAH. This distancing stands in stark contrast to the core reasoning for recognizing institutional negligence against hospitals and HMOs, as discussed in *Darling*, *Jones*, and *Shannon*—namely, the institution's interjecting itself into coordinating and restricting the medical care of patients rather than merely facilitating that care.

¶ 264    Plaintiff claims "Infinity is part of the 'snow globe' of advertisement and medical services the court identified" in *Solorzano v. Magnani*, 2024 IL App (1st) 221169, ¶ 36. However, that case dealt with apparent agency and vicarious liability, not institutional liability. *Id.* ¶¶ 3, 20.

¶ 265    We conclude that because Infinity does not provide comprehensive care or make managerial decisions affecting the overall system of patient care, the analogy to a hospital fails.

¶ 266                    3. *Applying the Traditional Duty Test Here*

¶ 267    Turning to the traditional test for the imposition of a duty, we consider four factors: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Coleman v. Provena Hospitals*, 2018 IL App (2d) 170313, ¶ 17. "Any analysis of the duty element turns on the policy considerations inherent in the above factors, and the weight accorded each of the factors depends on the circumstances of the particular case." *Doe-3 v. McLean*

*County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 22.

¶ 268        Although it is reasonably foreseeable that a patient could be harmed by a failure to implement proper policies, the third and fourth factors weigh strongly against imposing a duty on Infinity. Plaintiff essentially asks that we compel Infinity to promulgate its own policies and procedures, train its employees on those policies and procedures, and supervise their employees while they are contracted out to a hospital to staff the hospital's emergency department. Such a policy would impose entirely new responsibilities on Infinity far beyond the scope of those it currently undertakes, compelling it to inject itself as an institution into the medical care of patients at SAH.

¶ 269        The absurdity of imposing such a duty on an independent medical staffing group is well illustrated by the fact that part of plaintiff's claim is that Infinity failed to implement *discharge* procedures within SAH's emergency department. We fail to see the utility or necessity of shifting the burden of supervising a hospital's emergency department to an entity solely responsible for providing medical staff to the hospital. SAH is in the best position to both promulgate and enforce policies within its own facility. To impose a separate and independent duty on Infinity to create its own set of policies and procedures would create an unworkable system in which providers are forced to serve two masters, potentially navigating conflicting institutional directives.

¶ 270        Further, imposing a duty on Infinity as plaintiff suggests would conflate the claims of professional negligence and institutional negligence. Plaintiff seeks to impose institutional liability on Infinity for the precise failure giving rise to the vicarious liability claim against it—namely, Gaziano's failure to identify a stroke using his own medical expertise. See *Jones*, 191 Ill. 2d at 298 ("[T]he tort of institutional negligence 'does not encompass, whatsoever, a hospital's responsibility for the conduct of its *** medical professionals.' ") (quoting *Advincula*, 176 Ill. 2d

at 31).

¶ 271     Even if a duty for a patient's benefit did apply to a medical staffing group like Infinity, plaintiff has not alleged facts showing that Infinity breached that duty or that any supposed breach proximately caused the patient's injury. See *Frigo v. Silver Cross Hospital & Medical Center*, 377 Ill. App. 3d 43, 69-70 (2007) (reciting the elements of negligence). If a plaintiff cannot establish a factual basis for any single element of her cause of action, summary judgment in favor of the defendant is proper. *Milevski v. Ingalls Memorial Hospital*, 2018 IL App (1st) 172898, ¶ 28.

¶ 272     Plaintiff does not dispute that the agreement between Infinity and SAH required Infinity's employees to abide by the hospital's policies and procedures. At the time of the alleged malpractice, SAH had policies in place for the diagnosis and treatment of strokes and the discharge of patients from the emergency department. Ludgin conceded that SAH's policies were appropriate because they required a PA to immediately contact a physician if a patient exhibited signs and symptoms of a stroke. Ludgin also acknowledged Gaziano's testimony that he was aware of this policy and, had he believed Rhonda was experiencing symptoms of a stroke, he would have consulted with a physician as the policy required.

¶ 273     We emphasize that the "failure to implement" policies and procedures cannot equate to "ensuring" that no medical provider violates his own duty of care to a patient. See *Pickle v. Curns*, 106 Ill. App. 3d 734, 739 (1982) ("We do not recognize the existence of a duty on the part of the hospital's administration to insure that each of its staff physicians will always perform his duty of due care to his patient."). "A hospital is not an insurer of a patient's safety. It owes him a duty of protection, and it must exercise a degree of reasonable care towards him as his known condition requires." *Reynolds v. Mennonite Hospital*, 168 Ill. App. 3d 575, 579 (1988).

¶ 274     Therefore, we agree with the trial court that Infinity did, in fact, have procedures

and policies in place that met the standard of care through its contract with SAH, and any claim that Infinity's failure to promulgate its own policies caused Rhonda's injuries lacks any evidentiary support.

¶ 275    Accordingly, we conclude that the trial court did not err by granting summary judgment for Infinity because Infinity did not owe a duty to implement policies in the SAH emergency department.

¶ 276    In closing, we thank the trial court for its thoughtful and comprehensive written judgment order, which we found very helpful in understanding the complex facts of this case and resolving the issues it presented.

¶ 277    III. CONCLUSION

¶ 278    For the reasons stated, we affirm the trial court's grant of Infinity's motions for summary judgment, reverse its grant of summary judgment in favor of SAH regarding apparent agency, and remand for further proceedings.

¶ 279    Affirmed in part and reversed in part; cause remanded.

***Martin v. Layman*, 2025 IL App (4th) 240278**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 16-L-319; the Hon. Lisa R. Fabiano, Judge, presiding. |
| **Attorneys for Appellant:** | Robert G. Black, of Law Offices of Robert G. Black, P.C., of Naperville, and Miguel Ruiz and James Edwards, of Cogan & Power, P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Ryan T. Armour, of Allen Galluzzo Hevrin Leake, LLC, of Rockford, and Scott L. Howie, Karen Kies DeGrand, and Alexandra M. Frisch, of Donohue Brown Smyth LLC, of Chicago, for appellees Jason Layman and Infinity Healthcare Physicians, S.C. |
| | Marilee Clausing, Jacob Z. Goldstein, and Sapna G. Lalmalani, of Hall Prangle & Schoonveld, LLC, of Chicago, for other appellee. |